Rel: December 20, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

_____

## CR-2023-0284

_____

## State of Alabama

## v.

## Albert Mack III

_____

## Albert Mack III

## v.

## State of Alabama

## Appeals from Tuscaloosa Circuit Court
## (CC-93-1204.60)

KELLUM, Judge.

The State of Alabama appeals the Tuscaloosa Circuit Court's order

granting, in part, Albert Mack III's petition for postconviction relief, filed

pursuant to Rule 32, Ala. R. Crim. P., attacking his capital-murder conviction and sentence of death. The circuit court found that Mack had been deprived of the effective assistance of counsel at the penalty phase of his capital-murder trial and set aside Mack's sentence of death. Mack cross-appeals the court's denial of his claim that his death sentence is unconstitutional because the jury did not "find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and did not reach a unanimous verdict at sentencing." (Mack's brief at p. 61.) See Rule 32.10, Ala. R. Crim. P.

In 1995, Mack was convicted of murdering Patrick Holman during the course of a robbery, an offense defined as capital by § 13A-5-40(a)(2), Ala. Code 1975. The jury, by a vote of 10 to 2, recommended that Mack be sentenced to death.[1] The circuit court sentenced Mack to death after finding that the murder was committed while Mack was under a sentence of imprisonment, that Mack had previously been convicted of a felony

---

[1]Effective April 11, 2017, §§ 13A-5-45, 13A-5-46, and 13A-5-47, Ala. Code 1975, were amended to place the ultimate sentencing decision solely in the hands of the jury. Here, the versions of §§13A-5-45, 13A-5-46, and 13A-5-47 applicable to Mack placed the ultimate sentencing decision with the trial judge.

involving the use or threat of violence to another person,[2] and that the murder was committed during the course of a robbery.

Mack's conviction and sentence were affirmed on direct appeal. See Mack v. State, 736 So. 2d 664 (Ala. Crim. App. 1998), aff'd, 736 So. 2d 681 (Ala. 1999). The United States Supreme Court denied certiorari review. See Mack v. Alabama, 528 U.S. 1006 (1999). On June 14, 1999, this Court issued a certificate of judgment making the judgment on direct appeal final. See Rule 41, Ala. R. App. P.

In August 2000, Mack filed a timely postconviction petition in the county of his conviction, attacking his capital-murder conviction and sentence of death.[3] The delay in the postconviction proceedings appears to be based, in part, on issues related to discovery. In September 2000,

---

[2]The record shows that in January 1989 Mack was convicted of assault with a deadly weapon in Oceanside, California. He was paroled for that offense in May 1992. Mack then obtained permission to move to Alabama. Mack was on parole for that California conviction when he killed Patrick Holman.

[3]At the time that Mack filed his postconviction petition, the limitations period for filing a Rule 32, Ala. R. Crim. P., petition was two years from the date that the Court of Criminal Appeals issued its certificate of judgment. See former Rule 32.2(c), Ala. R. Crim. P. Effective March 22, 2002, Rule 32 was amended to change limitations period to one year.

Mack filed a motion for discovery related to the race, gender, and age of the grand and petit juries in Tuscaloosa County from 1978 through 1995. Mack further requested discovery of law-enforcement records from 17 different state agencies so that he could obtain criminal histories for law-enforcement personnel connected to Mack's case. The circuit court denied that motion. In November 2002, Mack filed a petition for a writ of mandamus with this Court, attacking the court's discovery ruling. This Court granted partial relief. See Ex parte Mack, 894 So. 2d 764 (Ala. Crim. App. 2003).[4] Mack then filed a petition for a writ of certiorari in the Alabama Supreme Court, and the State filed a similar petition. The Supreme Court denied the writ as to Mack and quashed the writ as to the State. See Ex parte Mack, (No. 1022107, Jan. 15, 2004) and State v. Mack, (No. 1022069, Aug. 27, 2004).[5]

---

[4]This Court found that Mack was entitled to the demographic information related to his grand and petit juries. That decision was overruled, in part, by Ex parte Jenkins, 972 So. 2d 159 (Ala. 2005).

[5]In 2010, Mack filed a second petition for a writ of mandamus with this Court, requesting that we direct the circuit court to compel the State to provide discovery responses, as directed by this Court in 2003. This Court granted that petition. See Ex parte Mack (No. CR-09-0973, June 9, 2010), 77 So. 3d 635 (Ala. Crim. App. 2010) (table).

In December 2002, February 2003, and October 2009, the State moved the circuit court to partially dismiss numerous claims because, it argued, those claims were procedurally barred in Mack's postconviction proceeding or were insufficiently pleaded.[6] In December 2002, the circuit court dismissed some claims after finding that they were procedurally barred.

In March 2010, the circuit court held a hearing on the State's 2009 motion to dismiss. At that hearing, the State argued, in part, that, at the time Mack appealed his capital-murder conviction to this Court, the procedure set out in Ex parte Jackson, 598 So. 2d 895 (Ala. 1992),[7] was in place and Mack's appellate counsel did not timely comply with that procedure. Thus, the State argued, Mack's claims of ineffective assistance of counsel was procedurally barred pursuant to Rule

---

[6]This Court has held that discovery in postconviction proceedings relates to the issues that are raised in the petition. We have held that discovery should not be granted if that discovery relates to an issue that is procedurally barred. See Duncan v. State, 925 So. 2d 245 (Ala. Crim. App. 2005).

[7]In Jackson, the Alabama Supreme Court established a procedure for newly appointed appellate counsel to use to raise a claim of ineffective assistance of counsel on direct appeal. The Alabama Supreme Court has overruled its holding in Jackson. See Ex parte Ingram, 675 So. 2d 863 (Ala. 1996).

32.2(a)(5), Ala. R. Crim. P. The circuit court granted the State's motion and dismissed Mack's claims of ineffective assistance of counsel.

Mack moved the circuit court to reconsider its ruling dismissing his ineffective-assistance claims because, he argued, his appellate counsel was not appointed until after the period to file a motion for a new trial had expired.[8] In response, the State moved the circuit court to grant Mack's motion to reconsider and to reinstate Mack's claims of ineffective assistance of counsel. (C. 379.) In April 2021, the circuit court granted Mack's motion to reinstate. (C. 547.)

In May 2021, Mack filed his fifth amended postconviction petition -- the petition that is the subject of these appeals. A hearing was held in August 2022. In March 2023, the circuit court issued a 41-page order granting, in part, Mack's petition after finding that he had been deprived of the effective assistance of counsel at the penalty phase of his capital-murder trial because counsel had failed to investigate and present mitigating evidence of his life history which included an abusive

---

[8]It appears that appellate counsel did move to extend the time to assert his ineffective-assistance claims under the procedure set forth in Jackson, but that motion was not timely.

6

childhood.[9]  The State filed a notice of appeal to this Court.  Mack then filed a cross-appeal from the denial of his claim that his sentence of death was unconstitutional.

In this Court's opinion on direct appeal, we stated the following concerning the facts of Mack's conviction:

> "On the night of July 12, 1993, Patrick Cory Holman's body was found inside the trunk of a partially burned 1974 Oldsmobile Cutlass automobile. The Cutlass was parked on the side of Sanders Ferry Road near the entrance to the Royal Pines subdivision, a suburban neighborhood near Tuscaloosa. He had been killed instantly by a gunshot to the back of his head; his body had been placed in the trunk; and the automobile had been set on fire.
>
> "....
>
> "Mack does not dispute that he intentionally shot Holman in the back of the head or that the shot killed him. He denies that the shooting occurred during the course of a robbery. Mack's theory of defense is that when he shot Holman, he believed that Holman and Holman's cousin, Carlos Green, intended to kill Mack and/or his friend Roy Craig, Jr., because Craig had sold Holman approximately $500 worth of 'bad dope.' Mack was a friend of both Craig and Holman and had facilitated the drug transaction between Craig and Holman by introducing Holman to Craig."

Mack, 736 So. 2d at 666 (footnote omitted).

---

[9]The order that the circuit court signed adopted a proposed order submitted to the court by Mack's attorney's granting partial relief. The State does not challenge the court's adoption of that order on appeal.

Standard of Review

According to Rule 32.3, Ala. R. Crim. P.:

"The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence."

"The standard of review on appeal in a postconviction proceeding [after an evidentiary hearing] is whether the trial judge abused his discretion when he denied the petition." Elliott v. State, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992). "[W]hen the facts are undisputed, and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." Ex parte White, 792 So. 2d 1097, 1098 (Ala. 2001). "[W]hen there are disputed facts in a postconviction proceeding and the circuit court resolves those disputed facts, '[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition.'" Boyd v. State, 913 So. 2d 1113, 1122 (Ala. Crim. App. 2003), quoting Elliott, 601 So. 2d at 1119. See also Mashburn v. State, 148 So. 3d 1094, 1104 (Ala. Crim. App.

8

2013). "We will reverse a circuit court's findings only if they are 'clearly erroneous.'" Barbour v. State, 903 So. 2d 858, 861 (Ala. Crim. App. 2004).

In assessing claims of ineffective assistance of counsel, we apply the standard adopted by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).

> "In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
>
> > "'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
>
> "466 U.S. at 687, 104 S.Ct. at 2064.
>
> > "'The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances."' Daniels v. State, 650 So. 2d 544, 552 (Ala. Cr. App. 1994), cert. denied, [514 U.S. 1024,

115 S.Ct. 1375, 131 L.Ed.2d 230 (1995)], quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. 'A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.

"The claimant alleging ineffective assistance of counsel has the burden of showing that counsel's assistance was ineffective. Ex parte Baldwin, 456 So. 2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed. 2d 300 (1985). 'Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall "outside the wide range of professionally competent assistance." [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066.' Daniels, 650 So. 2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So. 2d 6 (Ala. Cr. App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So. 2d 531 (Ala. Cr. App. 1985). 'This court must avoid using "hindsight" to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance.' Hallford, 629 So. 2d at 9. See also, e.g., Cartwright v. State, 645 So. 2d 326 (Ala. Cr. App. 1994).

> '"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney

10

performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'

"Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So. 2d 1370, 1372 (Ala. 1987).

"'Even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068.'

"Daniels, 650 So. 2d at 552.

"'When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently

11

> reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'
>
> "Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted in Thompson v. State, 615 So. 2d 129, 132 (Ala. Cr. App. 1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed. 2d 418 (1993)."

Bui v. State, 717 So. 2d 6, 12-13 (Ala. Crim. App. 1997).

At trial, Mack was represented by attorneys John Sutton and Wayne Williams. Both attorneys testified at the postconviction evidentiary hearing.

> "'The credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. This Court cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses.' Hope v. State, 521 So. 2d 1383, 1387 (Ala. Crim. App. 1988). Indeed, it is well settled that, in order to be entitled to relief, a postconviction 'petitioner must convince the trial judge of the truth of his allegation and the judge must "believe" the testimony.' Summers v. State, 366 So. 2d 336, 343 (Ala. Crim. App. 1978). Thus, we afford the circuit court's findings great deference on appeal. Ex parte Gissendanner, 288 So. 3d [1011] at 1029 [(Ala. 2019)]."

State v. Petric, 333 So. 3d 1063, 1072 (Ala. Crim. App. 2020).

"The Alabama Supreme Court in Ex parte Gissendanner, 288 So. 3d 1011 (Ala. 2019), recognized that, when a circuit court grants relief on

12

a postconviction petition, we afford the court's findings of fact deference on appeal."[10] State v. Lewis, 371 So. 3d 863, 890 (Ala. Crim. App. 2022).

With these principles in mind, we review the issue raised by the State in its appeal and the issue raised by Mack in his cross-appeal.

## I. State's Appeal

On appeal, the State argues that the circuit court erred in finding that Mack had been deprived of the effective assistance of counsel at the penalty phase of his capital-murder trial. Specifically, the State argues that the circuit court erred in finding that Mack had met his burden of proof under Strickland v. Washington, that the court failed to consider his trial counsel's testimony that his decisions on what mitigating evidence to present were strategic, and that the court failed to consider the mitigation evidence that had been presented.

In its order granting partial relief, the circuit court made the following findings:

"Mack's counsel, Wayne Williams and John Sutton, were appointed to the case on July 20, 1993. …Williams

___

[10]Like in Lewis, the judge who presided over Mack's postconviction proceedings was not the same judge who presided over his trial. We would apply even a greater degree of deference if the same judge presided over the trial and the postconviction proceedings. See Ex parte Gissendanner, 288 So. 3d 1011 (Ala. 2019).

13

served as lead counsel, and Sutton served as second chair. On July 22, 1993, shortly after their appointment, Williams and Sutton met with Mack for the first time. Mack told them about the offense, explaining that he had shot the decedent. He also provided information about his background, including that he was raised in Tuscaloosa, Alabama, and Ypsilanti, Michigan, that his father was 'not a strong parental figure,' that he had done well in high school in Ypsilanti, that he had served in the Marines, and that he had spent time in prison in California prior to returning to Alabama.

"In the 28 months after that meeting -- from July 22, 1993, through November 21, 1995, which was six days before trial -- Williams and Sutton did not conduct any meaningful mitigation investigation. During that time, they did not have a mitigation investigator, and the Court finds that they also did not request any records or conduct any life-history interviews themselves. … At the Rule 32 hearing, Sutton was asked, in reference to the period prior to November 1995, 'were you or anyone else working on mitigation investigation for the case?' He replied, 'No.'

"The fact that Williams and Sutton did not conduct any meaningful mitigation investigation in the 28 months between July 1993 and November 1995 is confirmed by the way in which they handled various matters that arose in that period. In August 1993, they each received a letter from Lucia Penland at the Alabama Prison Project, a nonprofit organization that provided assistance to capital defense teams and had learned about Mack's case. Penland explained that the Alabama Prison Project could assist counsel with 'developing social histories,' 'identifying and interviewing character witnesses,' and 'extensive collection of records,' among other tasks. Williams and Sutton did not obtain investigation assistance form the Alabama Prison Project or anyone else at that time.

"Seven months later, in March 1994, Sutton prepared a draft of an 'Ex parte Application for Investigative Expenses.' The draft application requested 'up to $2,500 for investigative services and expenses.' In support of the request, the draft stated:

"'14. In order to prepare properly for all trial phases, counsel is required to obtain information relevant to Albert Mack, III's medical history, educational history, employment and training history, family and social history, his correctional history, and any religious or cultural influences. American Bar Association, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(A)(2)(c) (adopted by the ABA House of Delegates February 7, 1989). Therefore, counsel must direct any investigator to obtain records from all doctors, hospitals, schools, employers, and correctional facilities and interview people with knowledge of these aspects of Albert Mack III's background.

"'15. Visits to schools, hospitals, churches, and other institutions that have come into contact with Albert Mack, III are essential to obtaining documentary evidence and discovering mitigating information.'

"Sutton signed the draft application and sent it to Williams. However, Williams and Sutton never filed the application, and they did not obtain investigation assistance at that time.

"In the first half of 1995, the Alabama Department of Mental Health and Mental Retardation wrote three letters to Williams and Sutton regarding its upcoming mental state evaluation of Mack at the Taylor Hardin Secure Medical Facility. In all three letters, the Department requested that counsel send information about Mack's life history and mental

15

health. Neither attorney responded. As a result, the final report stated, 'Several requests to obtain information from defense attorneys were made by the Taylor Hardin Community Court/Liaison, however, such information had never been received as of the time of dictation of this report.'

"On November 21, 1995 -- six days before the capital trial -- Raymond Sumrall, a clinical social worker, began working on the case to assist with mitigation. Williams testified at the Rule 32 hearing that he hired Sumrall '[t]o provide advice to us as the case progressed.' Williams explained that he did not provide specific instructions to Sumrall: 'So really I did not sit down and say do this, do that. My expectations were not at that point important. I wanted to see what he did; and then I guess if they had not met my expectations, I might have made another request. …' Williams further testified that he and Sutton provided Sumrall with 'whatever information [they] had' that might be relevant to sentencing. The materials they provided Sumrall were the following: (1) 'Discovery materials about incident;' (2) 'Court records from criminal court in San Diego County, California;' (3) 'Sentencing report from California probation and parole authorities;' and (4) 'Clinical report from Taylor Hardin Secure Facility.' The Court finds counsel had not collected any of these documents through independent investigation; instead, they had received all of them from the prosecution or Taylor Hardin.

"On November 24, 1995 -- three days before the capital trial -- Williams and Sutton met with several of Mack's family members. Sutton was 'fairly certain [it] would have been a group meeting.' This meeting, however, was not focused on mitigation. Counsel were focused more on the guilt phase than the penalty phase, and they later called two of the family members who attended the meeting to testify at the guilt phase. Sharon Murray, Mack's sister, was one of the family members who was present at the meeting, and trial counsel later called Murray to testify at the guilt phase about her

interactions with Mack immediately after the offense. Murray testified credibly at the Rule 32 hearing that counsel never asked her about Mack's life history or any abuse or violence that she and Mack suffered or witnessed as children. The Court finds that Williams and Sutton did not conduct any meaningful life-history interviews with family members at the November 24 meeting or at any other time in the week before trial.

"....

"On the morning of December 1, 1995 -- the morning after Sumrall provided his preliminary report to Williams and Sutton -- Mack was convicted of capital murder. The penalty phase began an hour later. Because of their limited investigation, Williams and Sutton were unaware of many of the key facts about Mack's life, including the poverty and instability that pervaded his childhood, the nature and severity of the abuse he suffered at the hands of his father, the violence he witnessed between his parents, and the instances in which he tried to help other people and protect them from abuse.

"The penalty phase record reflects counsel's lack of preparation for this phase of the trial. Williams began his opening statement at the penalty phase with this: 'May it please the Court and ladies and gentlemen of the jury, I don't have any notes for this part of the trial.' After the State presented two witnesses concerning aggravating circumstances, Williams called five witnesses -- a parole officer from California who had testified for the State, plus four witnesses who worked for the Tuscaloosa County Sheriff's Department. At least one of the witnesses from the sheriff's department did not know until that morning that he could be called. The sheriff's department witnesses testified that while at the jail awaiting trial, Mack had expressed remorse, had spoken with young people to encourage them to avoid criminal behavior, and had assisted jail staff with

17

security matters. Williams and Sutton did not present any substantive evidence about Mack's upbringing or life before the crime. The jury then voted 10 to 2 for a death sentence."

(C. 7676-85.)

Initially, when evaluating any case of ineffective assistance of counsel related to the penalty phase of a capital-murder trial, we must consider what counsel did, in fact, present in the way of mitigation. "'Although petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer did in fact.' Chandler v. United States, 218 F.3d 1305, 1320 (11th Cir. 2000)." Ray v. State, 80 So. 3d 965, 979 (Ala. Crim. App. 2011).

<u>Mitigation Presented at Trial</u>

The direct-appeal record shows that at the penalty phase Mack's trial counsel presented the testimony of several law-enforcement officers.[11] The testimony centered around the fact that since Mack had been incarcerated he had been talking to high-risk juveniles and had been counseling them about the mistakes that he had made that resulted

---

[11]This Court has taken judicial notice of this Court's records from Mack's direct appeal. See Ex parte Salter, 520 So. 2d 213, 216 (Ala. Crim. App. 1987).

in his incarceration and how they could make decisions so that they would not end up like him.

Lieutenant Mark Herring with the Tuscaloosa County Sheriff's Department testified that he first met Mack when he was taking three juveniles on a tour of the jail. He said that Mack made a point of talking to those kids about the mistakes that he had made and that they had a choice to change the direction of their lives. Lt. Herring said that he took about a dozen juveniles to talk to Mack and that Mack helped those juveniles. (Direct Appeal, R. 1212.)

Edmon Sexton, the Sheriff of Tuscaloosa County, testified that in his time as sheriff he had organized a program to help high-risk youths regain control of their lives. He said that he would organize tours of the jail, that he had asked Mack to speak to those groups, and that Mack had spoken to over a thousand kids. Many different local groups, he said, frequently requested that Mack speak with them. He said that Mack had made a difference in the lives of these juveniles. (Direct Appeal, R. 1221.) Sheriff Sexton said that he received a lot of positive feedback from Mack's discussions with the juveniles. Mack, he said, had also assisted with a security breach at the jail that involved one of the sheriff's employees

19

having sex with a man that had been charged with capital murder. Mack agreed to assist in gathering evidence in that case.

Two other officers testified about Mack's behavior while incarcerated. James Taggart, the Chief of Jail Operations for the Tuscaloosa County Sheriff's Department, testified, and his testimony was very similar to that of Sheriff Sexton. Deputy John Barker of the Tuscaloosa County Sheriff's Department also testified concerning Mack's interactions with high-risk juveniles and the positive impact that Mack's actions had had on the juveniles involved.

### Mitigation Presented at Postconviction Hearing

Unlike the evidence that trial counsel presented at Mack's sentencing hearing, at the postconviction hearing Mack's counsel presented the testimony of family, friends, and teachers. The testimony of one of Mack's sisters painted a bleak picture of Mack's childhood, a childhood marked by extreme poverty, physical abuse, and neglect. The testimony of friends and teachers showed how helpful and kind Mack was to everyone that he encountered. In support of the testimony that was presented at the hearing, Mack also presented his school records, his

Department of Human Resources ("DHR") records,[12] and his military records. (C. 7917-9452.)

Sharon Murray, Mack's youngest sister, testified concerning the difficult childhood that she and her five siblings shared, that her father frequently drank and was violent, that her father burned her mother with a hot skillet, that her father frequently threw food at her mother, that her father frequently yelled obscenities at her mother, that her mother had "bruises, welts, scratches" on a lot of occasions, and that she and her siblings were afraid that her father would kill their mother. At one point, she said, Mack went to their father and told him to stop abusing their mother and her father beat Mack. Murray further testified that their father would call them all bad names, that he would frequently "whoop" them with an extension cord, that their beatings were more severe when their father was drunk, and that at one point her eldest sister reported their father to DHR for abusing them. After her sister made the report, she said, a social worker came to their house. After the social worker left, her father beat them all and kicked one of her sisters

---

[12]The DHR records for Mack's mother and the Mack family were admitted as Exhibit 44 and consisted of 273 pages. (R. 205.)

out of the house. Murray testified that Mack was protective of his sisters and mother and that Mack bore the brunt of their father's abuse because of Mack's desire to protect them. (R. 183.) Murray also testified about the unstable environment that they grew up in. She said that they lived in an "abandoned house" when they first moved to Michigan, that at one point they lived in two rooms in a rundown transient motel, and that they also lived in the "First Court Projects." Mack went into the military right after high school, and Murray did not see Mack again, she said, until their father was dying of throat cancer. (R. 186.) Mack helped take care of their father until he died. Murray further testified that she did talk to Mack's trial lawyers but that they did not ask any questions about Mack's childhood or the abuse that her family suffered at the hands of their father. (R. 189.)

Jean Allen, a former employee of the Tuscaloosa County DHR, said that DHR's first contact with Mack and his family was in January 1970 and that DHR had frequent contact with the Mack family until they moved to Michigan in 1978. (R. 206.)[13] When DHR first contacted the Mack family, she said, the family had no income and no resources. (R.

---

[13]Mack was born in 1967.

22

209.) Her records indicated that Mack's family struggled to feed the children or to fulfill any of their basic needs. She quoted from those records:

> "Mrs. Mack and her six children continue to live in an apartment in Hay Court. Mrs. Mack stated that her husband, Albert, deserted the family approximately four months ago. Mrs. Mack said he had had a drinking problem for a long time prior to his desertion. Mr. Mack previously had reported to be in Detroit, but Mrs. Mack said she really does not know where he is. He left town in a car which was borrowed from her cousin, and neither the police nor her family have been able to trace it since he left."

(R. 213.) She testified that the records showed that Mack's father was the most abusive towards Mack. (R. 217.) Allen read another excerpt from the DHR records:

> "Mr. Mack seemed to have taken most of his hostilities out on Albert. If Albert came in from school with his shirttail out, the father would get very angry and even punish him for it. Mr. Mack would get very angry if any of the children brought in a paper from school that had a bad grade on it. Mrs. Mack stated it didn't necessarily have to be a bad grade but when it just was not a perfect score, and he would get angry with all of the children but especially with Albert. Mrs. Mack stated that Albert had gotten very withdrawn and was extremely nervous. Mrs. Mack went to a [Parent Teacher Association] meeting and the teacher told Mrs. Mack that Albert was very afraid of failure. The teacher felt that this was causing undue pressure on Albert. Albert is very afraid of being scolded and if he is scolded, he cries for hours. Mrs. Mack stated that when Albert comes home from school he goes off into a room by himself and stays until it is time to go to bed. Mrs. Mack

23

> is very concerned about Albert and wanted to know if there was anything that we could do to help such as referring him to Mental Health. I told Mrs. Mack he would be referred to Mental Health for counseling, and she requested that this be done."

(R. 217-18.) Allen testified that she remembered that the Mack house was in "bad shape" and that the Mack family was one of the saddest cases that she had ever seen. (R. 218.)

Glenda Starks testified that she grew up with Mack in the same neighborhood in Ypsilanti, Michigan, and that she lived two doors down from Mack. (R. 265.) Starks testified that they frequently heard shots in the neighborhood in the evenings, that drugs were prevalent in the community, that she saw Mack's father almost daily and that he was always drunk, that he had a temper when he was intoxicated and would frequently scream at Mack's mother, that she was afraid of Mack's father, and that Mack's father had "propositioned her for sex and money" when she was in high school. Starks also testified that Mack saved her from being raped when she was in high school. She said that she had not been contacted by Mack's trial attorneys.

Mack's sixth-grade teacher, Jacquline Dudley, testified that she remembered Mack. (R. 234.) She said: "I just remember his smile. I

remember he was very gentle. He was a very likeable student, but also he was very, very creative. He was very artistic. He used to like to draw; and as a student, I was … very struck by his creativeness." (R. 235.) She said that she was not contacted by Mack's attorneys before Mack's trial. (R. 239.) Elette Collins testified that she wrote an article that appeared in a newspaper in Ypsilanti about a "mural that Albert Mack had drawn in the hallways of our middle school. …" (R. 244.) Robert Samuel Still testified that he was one of Mack's teachers in middle school and that he also worked with Mack when Mack played basketball and ran track. (R. 310.) All of his teachers spoke very highly of Mack.

Two other teachers -- Pat Derossett and Chris Hennessy -- submitted affidavits. Derossett stated that she was one of Mack's fifth-grade teachers. Her affidavit reads, in part:

> "I became aware that Albert's family was living in substandard housing when I visited their home on West Michigan Avenue. The Macks lived on the second story of a rundown house, with rickety stairs and shaky landing at the top. It was a rental house that had been severely used and abused. There were holes in the walls and the floors were weak. Nor was there good hygiene or sanitation: garbage and dirt were all around. I remember that an old dog hung around the house. The conditions at the house were so bad that the family had to move to a transient motel."

25

(C. 7733.) Hennessy stated that he became aware of Mack when another teacher showed him Mack's art and that he assisted in getting Mack to paint various murals around the campus.

Counsel also presented testimony from one of Mack's military friends. Kent DeJong testified that he was in the Marine Corps and that he was in boot camp at the same time as Mack. (R. 285.) He said that without Mack's help he probably would not have made it through boot camp. He testified about how well Mack did in basic training. Mack was "separated" from military service after he hit a noncommissioned officer while he was drunk. (C. 7899.)

At the postconviction hearing, counsel also presented the testimony of Mack's two trial attorneys. Sutton testified that he had been licensed to practice law since 1984 and that he was appointed to represent Mack in 1993 along with co-counsel Wayne Williams. He had not represented a capital-murder defendant before representing Mack. (R. 72.) Williams was lead counsel, he said, and it was his responsibility to handle the motions while Williams handled the actual trial. He testified that they did retain an expert, Raymond Sumrall, to help with collecting mitigation evidence. (R. 73.) Sutton testified that he first met with Mack at the jail

in July 1993. (R. 75.) He further testified that he was aware of the importance of obtaining records related to Mack's life but that he did not obtain school records, social-services records, or any medical records related to Mack. (R. 79.) Other than talking with Mack, he said, they conducted no mitigation investigation until they hired the mitigation expert six days before trial.

Wayne Williams testified that he was the lead attorney in Mack's case but that he had never defended a client facing the death penalty, but he had been the District Attorney for Tuscaloosa County for six years. (R. 123.) He was questioned about his attorney-fee declaration in the case and stated that he had billed for 75 hours for out-of-court work on Mack's case. The following occurred:

> "[Mack's counsel]: Mr. Williams, did you or anyone else on the team obtain Mr. Mack's, Albert Mack's school records?
>
> "[Williams]: We did not that I know of. I did not.
>
> "[Mack's counsel]: Did anyone -- how about social services records regarding Mr. Mack or his family?
>
> "[Williams]: I did not receive any social -- what type records?
>
> "[Mack's counsel]: Social services records, like from DHR or someplace else?

"[Williams]: I did not receive any social records that I know of.

"[Mack's counsel]: How about medical records regarding Mr. Mack or his family about medical history?

"[Williams]: No, I do not believe so.

"[Mack's counsel]: And did you or anyone else on the team interview any teachers who taught Mr. Mack when he was in school?

"[Williams]: I did not.

"[Mack's counsel]: And how about coaches who coached Mr. Mack when he was in sports up in Michigan?

"[Williams]: That was in Michigan, and I did not interview anyone regarding coaches and so forth.

"[Mack's counsel]: How about people who were classmates of Mr. Mack when he was in school?

"[Williams]: Unless some of his sisters were his classmates, then the answer to that would be no. It's a possibility that, of course, talking with his sisters or one or two of them they may have been classmates or in school with him at the same time he was.

"[Mack's counsel]: And did you or anyone else on the team talk with anyone who was a neighbor of Mr. Mack when he was a child?

"[Williams]: Well, I don't believe so.

"[Mack's counsel]: And how about social services workers who worked -- like from DHR who worked with the Mack family?

"[Williams]: I did not know of any social services workers.

"[Mack's counsel]: And did you speak with anyone who served with Mr. Mack in the military?

"[Williams]: I did not."

(R. 126-27.) Williams testified that there was no one working on investigating the case except him and Sutton. (R. 130.) In November 1995, Williams said, he obtained approval for funds to obtain the services of Raymond Sumrall, an expert to assist in the penalty phase. (R. 133.) Mack's trial started the Monday after Thanksgiving or November 27, 1995. Sumrall's timesheet was also attached to Williams's fee declaration. It shows that his work on the case commenced on November 21, 1995 -- mere days before the trial began. Counsel did not receive Sumrall's report until November 30, 1995. (C. 136.) The penalty phase of the trial started on December 1. Williams testified:

> "At the penalty phase we presented the evidence that [Mack] had changed his life, that he had made a difference since this incident in other people's lives. We had -- we went with a strategy that if we could get law enforcement people to come sit on this stand and swear under oath that Albert Mack was serving a useful service to our community by trying to defer other people, particularly young people from crime, that that would be a significant -- something that a juror could consider in not giving [Mack] the death penalty. That from how horrible the act may have been, because they found him guilty of capital murder, but if they could get past that and look at

29

what he had been willing to do since that date that that was our best shot at getting that jury not to give the death penalty."

(R. 139.)

"[Mack's counsel]: And do you remember if you presented evidence about [Mack's] life before the crime?

"[Williams]: I did not present that I know of. Now, it may have been in [Sumrall's] report. I'm not sure at what point [Sumrall's] report went in or anything like that. I'm not sure what the State had on previous life or whatever. I do remember that our focus was we called the sheriff of Tuscaloosa County, who was a very popular sheriff, had been re-elected, to get the sheriff of the county to come to court and sit in this chair, because it was in this courtroom, and to testify that he had made a significant change in his life I thought would be enough on this case."

(R. 139-40.) Williams said that he was aware of Mack's background because he had spoken to Mack's mother and his sisters before trial. (R. 146-55.) Williams further testified:

"[Postconviction counsel]: … [F]rom the very first meeting with Albert you were talking to him about his childhood, his family, his school, life?

"[Williams]: We did that, but by the time that we were in the case Albert was in jail, and shortly after that reports began to come back to us about Albert's conduct in jail, about that he was settling down in the jail, that he kept down disturbances in the jail, that he was meeting with youths, people that would be brought by to him. That was <u>early on</u> when we would go to the jail and talk to him."

30

(R. 149-150) (emphasis added).

Strickland v. Washington

In Wiggins v. Smith, 539 U.S. 510 (2003), a case similar to the

present case, the United States Supreme Court addressed the application

of the Strickland two-pronged test as it relates to claims that an attorney

failed to investigate and present mitigation evidence at the penalty phase

of a capital-murder trial.  The Wiggins Court stated:

> "In this case, as in Strickland [v. Washington, 466 U.S.
> 668 (1984),] petitioner's claim stems from counsel's decision to
> limit the scope of their investigation into potential mitigating
> evidence. Id., at 673.  Here, as in Strickland, counsel attempt
> to justify their limited investigation as reflecting a tactical
> judgment not to present mitigating evidence at sentencing
> and to pursue an alternative strategy instead. In rejecting the
> respondent's claim, we defined the deference owed such
> strategic judgments in terms of the adequacy of the
> investigations supporting those judgments:
>
> > "'[S]trategic choices made after thorough
> > investigation of law and facts relevant to plausible
> > options are virtually unchallengeable; and
> > strategic choices made after less than complete
> > investigation are reasonable precisely to the
> > extent that reasonable professional judgments
> > support the limitations on investigation. In other
> > words, counsel has a duty to make reasonable
> > investigations or to make a reasonable decision
> > that makes particular investigations unnecessary.
> > In any ineffectiveness case, a particular decision
> > not to investigate must be directly assessed for
> > reasonableness in all the circumstances, applying

31

a heavy measure of deference to counsel's judgments.' Id., at 690-691.

"Our opinion in Williams v. Taylor[, 529 U.S. 362 (2000),] is illustrative of the proper application of these standards. In finding Williams' ineffectiveness claim meritorious, we applied Strickland and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.' 529 U.S., at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)). While Williams had not yet been decided at the time the Maryland Court of Appeals rendered the decision at issue in this case, cf. post, at 2546 (SCALIA, J., dissenting), Williams' case was before us on habeas review. Contrary to the dissent's contention, ibid., we therefore made no new law in resolving Williams' ineffectiveness claim. See Williams, 529 U.S., at 390 (noting that the merits of Williams' claim 'are squarely governed by our holding in Strickland'); see also id., at 395 (noting that the trial court correctly applied both components of the Strickland standard to petitioner's claim and proceeding to discuss counsel's failure to investigate as a violation of Strickland's performance prong). In highlighting counsel's duty to investigate, and in referring to the ABA Standards for Criminal Justice as guides, we applied the same 'clearly established' precedent of Strickland we apply today. Cf. 466 U.S., at 690-691 (establishing that 'thorough investigation[s]' are 'virtually unchallengeable' and underscoring that 'counsel has a duty to make reasonable investigations'); see also id., at 688-689 ('Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable').

"In light of these standards, our principal concern in deciding whether Schlaich and Nethercott exercised

32

'reasonable professional judgmen[t],' id., at 691, is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable. Ibid. Cf. Williams v. Taylor, supra, at 415 (O'CONNOR, J., concurring) (noting counsel's duty to conduct the 'requisite, diligent' investigation into his client's background). In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' Strickland, 466 U.S., at 688, which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,' id., at 689 ('[E]very effort [must] be made to eliminate the distorting effects of hindsight')."

539 U.S. at 521.

While it is true that strategic decisions are virtually unchallengeable, before a reviewing court may find that a decision was strategic, the reviewing court must first determine if counsel conducted a "thorough investigation" before making that decision. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 690-91. See also Blankenship v. Hall, 542 F.3d 1253, 1273 (11th Cir. 2008) ("In

33

addition to the duty to reasonably investigate avenues of defense (or make a reasonable decision to not do so), counsel's choice of strategy is subject to review, but 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable....' Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2066 (emphasis added).").

> "In order for counsel to make a professionally reasonable decision whether or not to present certain mitigating evidence -- in this case, any mitigating evidence -- that counsel must be informed of the available options. Thus, '[o]ur case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.' Horton [v. Zant], 941 F. 2d [1449] at 1462 [(11th Cir. 1991)] (citing King v. Strickland, 748 F.2d 1462, 1464 (11th Cir. 1984)); see Blanco v. Singletary, 943 F.2d 1477, 1502 (11th Cir. 1991), cert. denied, 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992); Harris v. Dugger, 874 F.2d 756, 763 (11th Cir.), cert. denied, 493 U.S. 1011, 110 S.Ct. 573, 107 L.Ed.2d 568 (1989); Armstrong v. Dugger, 833 F.2d 1430 (11th Cir. 1987); Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir. 1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 782 (1987). Although counsel need not 'investigate every evidentiary lead,' he must gather enough knowledge of the potential mitigation evidence to arrive at an 'informed judgment' in making that decision. Harris, 874 F.2d at 763."

Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995).

"Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable

investigation into one or more aspects of the case and when that failure prejudices his or her client." Towns v. Smith, 395 F.3d 251, 258 (6th Cir. 2005). In discussing what constitutes a reasonable investigation, courts have stated:

> "[T]he Supreme Court has looked to standards promulgated by the American Bar Association (ABA) as appropriate guides. See Wiggins [v. Smith], 539 U.S. [510] at 524, 123 S.Ct. [2527] at 2536-37 [(2003)]; see also [Bobby v.] Van Hook, 558 U.S. [4] at 7-8, 130 S.Ct. [13] at 17 [(2009)] (recognizing that in 1985, the ABA standards -- which we can look to as 'guides' -- provided that '[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant [to a mitigation investigation], as will mitigating circumstances surrounding the commission of the offense itself' (alteration in original)); Rompilla [v. Beard], 545 U.S. [374] at 387, 125 S.Ct. [2456] at 2465-66 [162 L.Ed.2d 360] [(2005)]; Williams [v. Taylor], 529 U.S. [362] at 396, 120 S.Ct. [1495] at 1514-15 [146 L.Ed.2d 389] [(2000)]."

Daniel v. Commissioner, Alabama Dep't of Corr., 822 F.3d 1248, 1262-63 (11th Cir. 2016) (footnotes omitted).

> "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) …. Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. id.,

11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences (...); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1982) ('The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing .... Investigation is essential to fulfillment of these functions')."

Wiggins v. Smith, 539 U.S. at 524-25.

"Whether trial counsel were ineffective for not adequately investigating and presenting mitigating evidence '"turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented."' McMillan v. State, 258 So. 3d 1154, 1168 (Ala. Crim. App. 2017) (quoting Commonwealth v. Simpson, 620 Pa. 60, 100, 66 A.3d 253, 277 (2013))."

Woodward v. State, 276 So. 3d 713, 773-74 (Ala. Crim. App. 2018).

### Deficient Performance

The circuit court specifically found that Mack's trial counsel's performance was deficient because they failed to investigate and present evidence of Mack's life history that included his abusive childhood. The State argues that the circuit court erred in not finding that counsel's decision on what mitigation evidence to present was based on trial

strategy. Specifically, the State asserts that the court erred when it "failed to credit the testimony of Williams." (State's brief at p. 15.)

The circuit court's order states, in part:

"The absence of a sufficient mitigation investigation in this case is especially striking since there was reason to believe from the beginning that the case might reach the penalty phase. Mack informed counsel in their first meeting that he had shot the decedent, and prior to trial, the defense sought to resolve the case by offering a guilty plea in exchange for a life-without-parole sentence. Still, counsel never made mitigation investigation a priority, and they failed to conduct an investigation that was sufficient to support a reasonable decision about what to present.

"The Court declines to credit Williams's testimony regarding his penalty-phase strategy for other reasons as well. Williams testified at the Rule 32 hearing that he made a strategic decision to present the evidence about Mack's time in jail 'versus presenting his family life and that type of mitigation to the jury.' But earlier in his testimony, Williams said he could not remember whether he presented Sumrall's report, which included some information about Mack's family life, to the jury. Williams also testified at the Rule 32 hearing that part of his thinking was that he wanted to avoid focusing the jury on Mack's prior record. However, Williams began the defense's penalty-phase case by calling a California parole officer and asking her, based on a lengthy probation report from Mack's prior case, what sentence the victim from the prior case thought Mack should have received. The fact that Williams told the jury that he did not have any notes for the penalty phase further undercuts his testimony about strategy.

"....

"In sum, the Court finds that Mack's counsel performed deficiently with respect to their investigation and presentation of mitigating evidence. They failed to conduct a reasonable investigation, and therefore they were not in a position to make a reasonable strategic decision about what to present at the penalty phase. The Court's conclusion that counsel performed deficiently is not based on any one fact. Instead, it is based on the totality of the facts, including that the attorneys, who had never defended a capital case, were on the case for 28 months before trial but did not start their mitigation work until six days before trial; they did not interview any of Mack's teachers, coaches, neighbors, social services workers, or fellow Marines; they did not request any records regarding Mack or his family; they did not respond when Taylor Hardin asked them for information about Mack; they did not pursue evidence of the abuse Mack suffered as a child, even after they learned about the abuse in general terms; they did not prepare or present to the jury any evidence about Mack's childhood, adolescence, or service in the Marines; they told the jury at the start of the penalty phase that they did not have any notes for this part of the trial; they presented at least one witness from the sheriff's department who did not know he would be called until that morning and all the other evidence regarding their approach to the penalty phase bears the hallmarks of deficient performance. This is a clear-cut case of deficient performance at the penalty phase."

(C. 7689-7693.)

First, "'it is important to note that "the mere incantation of 'strategy' does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances."'" Brecheen v. Reynolds, 41 F.3d

38

1343, 1369 (10th Cir. 1994), quoting <u>Bolender v. Singletary</u>, 16 F.3d 1547, 1558 (11th Cir. 1994).

Here, the circuit court found that counsel had not conducted a reasonable investigation into mitigating evidence until immediately before trial, thus, "Williams and Sutton were not in any position to make a reasonable strategic decision about what to present because they had failed to conduct a reasonable mitigation investigation." (C. 7686.) This finding is supported by the record. Although Williams testified that they looked into mitigation early after their appointment and did not wait until they hired the mitigation expert six days before Mack's trial began, Sutton testified that, other than talking with Mack, they did not conduct any mitigation investigation before they hired the mitigation expert six days before trial. Also, Williams's attorney-fee declaration for Mack's trial was admitted at the postconviction hearing. That document contains a very detailed account of the time that Williams billed for representing Mack and reflects that Williams met with Mack's mother and several of his sisters on November 24, 1995 -- mere days before Mack's trial. Murray also testified that counsel did not ask her about Mack's childhood before trial. The fee declaration also contains only one

reference to meeting or talking with any of Mack's family before trial. On November 14, 1995, Williams had a brief conversation with Mack's wife on the telephone. That entry reads: "Telephone call from client's wife, re: witnesses." (C. 7738.)[14] The fee declaration supports the circuit court's finding that no investigation into mitigation had been conducted until a week before trial and supports the circuit court's reliance on Sutton's testimony when resolving this credibility issue.

Also, Williams testified that he spoke to Mack several times and said that he learned about Mack's childhood. Certainly, any conversation with Mack should have alerted Williams to conduct a more extensive investigation into Mack's childhood and background. Nonetheless, faced with some knowledge of Mack's background, neither Williams nor Sutton attempted to obtain any DHR records or any other records or to conduct a more thorough investigation. Indeed, it appears that counsel stopped investigating "early on" when they discovered that Mack had been talking to high-risk juveniles and attempting to assist them. "[C]ounsel abandoned their investigation of [Mack's] background after having

_____

[14]The direct-appeal record shows that Mack's wife testified at the guilt phase of Mack's trial. (Direct Appeal, R. 1028.)

acquired only rudimentary knowledge of his history from a narrow set of sources." Wiggins, 539 U.S. at 524.

Moreover, as the circuit court found in its order, several months after counsel obtained documents from the Alabama Prison Project concerning representing a defendant charged with a capital offense, Sutton sent Williams a draft of a motion for investigative expenses so that counsel could obtain records from "schools, hospitals, churches, and other institutions that [came] into contact with Albert Mack III." (Mack's exhibit 16 at p. 8.) However, Williams never filed that motion. (R. 130.)

Indeed, in 1995, Taylor Hardin Secure Medical Facility ("Taylor Hardin") sent Mack's counsel letters requesting information concerning Mack's life history and mental health before Mack was evaluated at that facility. Counsel never responded to Taylor Hardin's request. (Direct Appeal, C. 228.)

Furthermore, Sumrall did not begin working on the case until a week before trial, and the only documents furnished to Sumrall were those documents that trial counsel had received from the prosecution through discovery or from Taylor Hardin. Sumrall was retained too late to conduct any type of meaningful investigation. See State v. Lewis, 371

41

So. 3d 863, 903 (Ala. Crim. App. 2022) ("[Counsel] testified that he did hire a mitigation expert, Dr. Ackerson; however, it is clear that this expert was hired too late to conduct an extensive mitigation investigation or to uncover the mitigation that was presented at the postconviction court evidentiary hearing."). Mack admitted that he killed Holman; thus, counsel had reason to focus on the sentencing phase.

> "Without conducting a reasonable investigation, counsel's choice of strategy will be arbitrary, as the strength of each potential strategic choice is contingent on the outcome of the initial investigation. Hooper [v. Mullin], 314 F.3d [1162] at 1170–71 [(10th Cir. 2002)]; Bouchillon v. Collins, 907 F.2d 589, 597 (5th Cir. 1990). Wiggins [v. Smith, 539 U.S. 510 (2003),] makes clear that to be reasonably diligent, counsel must '"conduct a thorough investigation of the defendant's background"' for 'all reasonably available mitigating evidence.' Id. at 522, 524, 123 S.Ct. 2527 (quoting Williams [v. Taylor], 529 U.S. [362] at 396, 120 S.Ct. 1495 [(2000)], and ABA Guideline 11.4. 1) (first emphasis added)."

Wilson v. Sirmons, 536 F.3d 1064, 1089 (10th Cir. 2008).

> "'[U]nder a Strickland [v. Washington, 466 U.S. 668 (1984),] analysis, trial counsel must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead.' [Charles v. Stephens, 736 F.3d 380] at 390 [(5th Cir. 2013)] (internal citations and quotation marks omitted). Accordingly, we have granted a COA [certificate of appealability] to a petitioner who demonstrated that despite some efforts by counsel to investigate and present a mitigation defense, the scope and adequacy of counsel's mitigation investigation was debatably unreasonable. Smith v. Dretke, 422 F.3d 269, 280 (5th Cir. 2005). In Smith, the

42

petitioner argued that counsel failed to investigate his 'troubled background and abusive upbringing,' failed to review his prison records that demonstrated his good behavior and neglected to present expert testimony regarding his drug and alcohol use. Id. at 277. Smith's trial counsel submitted affidavits asserting that they extensively interviewed Petitioner's family members and acquaintances. Id. Relying on Rompilla [v. Beard, 545 U.S. 374 (2005)], we reasoned that regardless of extensive interviews with family members, counsel had information available to them -- here, that Smith had a history of severe substance abuse and that Smith came from a disadvantaged background -- that would have led a reasonable attorney to investigate further, and thus the scope of their investigation was unreasonable. Id. at 283-84 ('[E]ven though trial counsel did do some investigating, the question was whether the investigation conducted could be considered adequate in light of professional norms.')."

Escamilla v. Stephens, 749 F.3d 380, 390-91 (5th Cir. 2014).

"When assessing the reasonableness of an attorney's performance, the Supreme Court has looked to standards promulgated by the American Bar Association (ABA) as appropriate guides. See Wiggins [v. Smith], 539 U.S. [510] at 524, 123 S.Ct. [2527] at 2536-37 [(2003)]; see also [Bobby v.] Van Hook, 558 U.S. [4] at 7-8, 130 S.Ct. [13] at 17 [(2009)] (recognizing that in 1985, the ABA standards -- which we can look to as 'guides' -- provided that '[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant [to a mitigation investigation], as will mitigating circumstances surrounding the commission of the offense itself' (alteration in original)); Rompilla [v. Beard], 545 U.S. [374] at 387, 125 S.Ct. [2456] at 2465-66 [162 L.Ed.2d 360] [(2005)]; Williams [v. Taylor], 529 U.S. [362] at 396, 120 S.Ct. [1495] at 1514-15 [146 L.Ed.2d 389] [(2000)]."

Daniel, 822 F.3d at 1262-63 (footnote omitted).

43

When making its findings, the circuit court made a credibility decision based on the testimony that had been presented at the postconviction hearing and the numerous exhibits that Mack furnished to the court. The court found Sutton's testimony concerning the lack of a mitigation investigation more credible than the testimony of Williams based, it said, on numerous questions raised in the record. "The credibility of witnesses is for the trier of fact, whose finding is conclusive on appeal. This Court cannot pass judgment on the truthfulness or falsity of testimony or on the credibility of witnesses." Hope v. State, 521 So. 2d 1383, 1387 (Ala. Crim. App. 1988). A reasonable attorney would have conducted a more thorough investigation given that Mack admitted that he killed Holman and that two sources requested information and records from counsel about Mack's childhood but never received those records. "Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form." Wiggins v. Smith, 539 U.S. at 535.

> "Applying Strickland [v. Washington, 466 U.S. 668 (1984),] Wiggins [v. Smith, 539 U.S. 510 (2003)], and Rompilla [v. Beard, 545 U.S. 374 (2005)], we have explained that, '[i]n investigating potential mitigating evidence, counsel must

44

either (1) undertake a reasonable investigation or (2) make an informed strategic decision that investigation is unnecessary.' Charles v. Stephens, 736 F. 3d 380, 389 (5th Cir. 2013). Thus, 'under a Strickland analysis, trial counsel must not ignore pertinent avenues of investigation, or even a single, particularly promising investigation lead.' Id. at 390 (internal citations and quotation marks omitted). Accordingly, we have granted a COA [certificate of appealability] to a petitioner who demonstrated that despite some efforts by counsel to investigate and present a mitigation defense, the scope and adequacy of counsel's mitigation investigation was debatably unreasonable. Smith v. Dretke, 422 F.3d 269, 280 (5th Cir. 2005). In Smith, the petitioner argued that counsel failed to investigate his 'troubled background and abusive upbringing,' failed to review his prison records that demonstrated his good behavior, and neglected to present expert testimony regarding his drug and alcohol use. Id. at 277. Smith's trial counsel submitted affidavits asserting that they extensively interviewed Petitioner's family members and acquaintances. Id. Relying on Rompilla, we reasoned that regardless of extensive interviews with family members, counsel had information available to them -- here, that Smith had a history of severe substance abuse and that Smith came from a disadvantaged background -- that would have led a reasonable attorney to investigate further, and thus the scope of their investigation was unreasonable. Id. at 283-84 ('[E]ven though trial counsel did do some investigating, the question was whether the investigation conducted could be considered adequate in light of professional norms.' )."

Escamilla, 749 F.3d at 390-91.

Based on our review of the circuit court's findings on counsel's performance, we cannot say that those findings are "clearly erroneous." See Barbour v. State, 903 So. 2d 858, 861 (Ala. Crim. App. 2004).

45

<u>Prejudice</u>

The State makes no argument in its brief to this Court regarding the circuit court's finding that Mack established that he was prejudiced by counsel's failure to investigate and present evidence concerning his life history and abusive childhood.

The circuit court made the following findings concerning the prejudice prong of the <u>Strickland</u> test:

> "To prove prejudice, Mack must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.' <u>State v. Smith</u>, 85 So. 3d [1063] at 1069 [(Ala. Crim. App. 2010)] (quoting <u>Strickland [v. Washington]</u>, 466 U.S. [668] at 694 [(1984)]). In other words, prejudice exists if there is a reasonable probability that, but for counsel's deficient performance, Mack would not have received a death sentence. See <u>Wiggins [v. Smith]</u>, 539 U.S. [510] at 536 [(2003)]. 'A reasonable probability is a probability sufficient to undermine confidence in the outcome,' <u>Id.</u> at 534. In assessing prejudice in this context, the Court 'reweigh[s] the evidence in aggravation against the totality of available mitigating evidence.' <u>Id.</u>[15]
>
> "....

---

[15]The next portion of the circuit court's order contains 13 pages of summaries of witnesses who testified at the postconviction evidentiary hearing. We discussed these witnesses' testimony earlier in this opinion. The circuit court gave a more in-depth discussion than we have in this opinion.

46

"Here, the evidence presented at the Rule 32 hearing paints an entirely different picture of Mack than the evidence presented at trial. As noted above, the trial evidence focused primarily on Mack's time in jail after his arrest[;] in contrast, the witnesses at the Rule 32 hearing described the circumstances of Mack's childhood, including profound poverty, extreme physical and verbal violence in the home, neglect and abandonment, and a family history of severe alcoholism. In addition, numerous records, including records from the Tuscaloosa Department of Human Resources, provided vivid accounts of Mack's tumultuous childhood. Ultimately, the evidence presented at the Rule 32 hearing alters the sentencing profile in this case significantly, and it establishes that counsel's deficient performance resulted in prejudice.

"....

"The mitigating evidence counsel failed to discover and present in Mack's case is powerful. The Court had the opportunity to watch the mitigation witnesses testify about their memories and observations. Their testimony was compelling and credible. It was moving to the Court and likely would have swayed jurors. The DHR records -- authored by the State's own social services workers -- provide direct, contemporaneously documented accounts of Mack's childhood. They also corroborate the witnesses' testimony. The Court finds it particularly compelling that a DHR worker testified that the Mack family's case was '[o]ne of the saddest cases' she had ever seen. The Court finds the testimony of Mack's sister, who described the 'dark' upbringing she shared with her brother, powerful. The fact that Mack's father repeatedly beat Mack and his sisters for no apparent reason other than that the children 'laugh[ed] too loud' is heartbreaking. The Court finds it compelling and moving that Mack tried to stop his alcoholic father from beating his mother, that he prevented four boys from sexually assaulting Glenda Starks, and that an accomplished Marine testified

47

that he 'look[ed] up' to Mack as an 'essential part of [their] platoon' during boot camp. The school records, newspaper articles, military records, medical records, photographs, and other documents not only corroborate the witnesses' testimony but also provide direct evidence about Mack's life.

"....

"The life-history evidence omitted from Mack's trial would have served as compelling mitigation. It also would have made it more difficult for the prosecution to argue -- as it did at trial and at the judicial sentencing proceeding -- that Mack's good conduct at the Tuscaloosa County jail was motivated by secondary gain ....

"....

"When compared to the evidence presented at trial, the evidence presented in post-conviction paints a vastly different picture of Mack. This is not a case in which the omitted mitigating evidence was cumulative to evidence that was presented to the jury or the judge. The omitted evidence was completely different and would have provided reasons for a sentence of life instead of death. Even without the omitted evidence, two jurors voted to recommend life without parole. The Court has reweighed the evidence in aggravation against the totality of the available mitigating evidence, and it finds that if counsel had not performed deficiently, there is a reasonable probability that the jury would not have recommended a death sentence and the trial court would not have imposed a death sentence. Mack has demonstrated prejudice.

"The Court finds that Mack's trial attorneys rendered ineffective assistance of counsel with respect to the penalty phase in this capital case. Therefore, the Court orders that Mack's Rule 32 petition is granted as to Claim I(A). ..."

48

(C. 7693-7711.)

Contrary to the State's contentions in brief, the order reflects that the circuit court applied the correct standard and relied on the case of Wiggins v. Smith when assessing whether Mack had been prejudiced by counsel's deficient conduct at the penalty phase.

> "In Strickland, we made clear that, to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id., at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."

Wiggins v. Smith, 539 U.S. at 534.

Mack's jury recommended, by a vote of 10 to 2, that he be sentenced to death. One juror's vote could have prevented the jury from recommending death. Section 13A-5-46(f), Ala. Code 1975, requires that at least 10 jurors vote for death.

> "[I]n assessing prejudice under Strickland in a capital case, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' Strickland, 466 U.S. at 695, 104 S.Ct. 2052. Given that the jury recommended a sentence of death by the narrowest possible vote under Alabama law, 10 to 2, Gavin 'need establish only

49

"a reasonable probability that at least one juror would have struck a different balance" between life and death.' <u>Jenkins v. Comm'r, Ala. Dep't of Corr.</u>, 963 F.3d 1248, 1270 (11th Cir. 2020) (quoting <u>Wiggins</u>, 539 U.S. at 537, 123 S.Ct. 2527); see also n.7, supra (discussing Alabama's capital sentencing scheme and that a recommendation of death requires the vote of at least ten jurors)."

<u>Gavin v. Comm'r, Alabama Dep't of Corr.</u>, 40 F.4th 1247, 1267 (11th Cir. 2022). "A 'reasonable probability' is less than a preponderance of the evidence, but 'sufficient to undermine confidence in the outcome.'" <u>Smith v. Mullin</u>, 379 F.3d 919, 942 (10th Cir. 2004).

We agree with the circuit court that the mitigating evidence that counsel failed to fully investigate and present was compelling. Many courts have described evidence of childhood abuse or difficult childhoods as "highly relevant to the question of moral culpability," an issue pivotal at sentencing, especially in this case after Mack admitted that he killed Holman.

"In <u>Smith [v. Mullin]</u>, this court noted that this type of evidence 'is exactly the sort of evidence that garners the most sympathy from jurors.' 379 F.3d [919] at 942 [(10th Cir. 2004)] (citing both empirical evidence and case law). The Supreme Court has similarly noted that evidence of borderline mental retardation and childhood poverty and abuse are highly relevant to the question of moral culpability. <u>Williams [v. Taylor]</u>, 529 U.S. [362] at 398, 120 S.Ct. 1495 [(2000)]; see also <u>Penry v. Lynaugh</u>, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ('[E]vidence about the

defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse.' (quotation omitted)), overruled on other grounds by <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); <u>Wiggins</u>, 539 U.S. at 535, 123 S.Ct. 2527 (quoting <u>Penry</u>). Evidence of the type set out above serves to humanize a defendant and explain why an otherwise kind and loving family man can come to participate in a violent, murderous event. See <u>Smith</u>, 379 F.3d at 943. Accordingly, this court cannot overstate the importance of the type of evidence that was available in this case but was never presented to the jury."

<u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1147 (10th Cir. 2007). See also <u>Porter v. McCollum</u>, 558 U.S. 30, 43 (2009) ("It is unreasonable to discount to irrelevance the evidence of Porter's abusive childhood, especially when that kind of history may have particular salience for a jury evaluating Porter's behavior in his relationship with [the victim]."); <u>Wiggins v. Smith</u>, 539 U.S. at 535 ("Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form. While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing

strategies are not necessarily mutually exclusive."); Williams v. Allen, 542 F.3d 1326, 1340-41 (11th Cir. 2008) ("Trial counsel's failure to pursue this additional evidence cannot be characterized as the product of a reasonable strategic decision. Counsel uncovered nothing in their limited inquiry into Williams' background to suggest that 'further investigation would have been fruitless.' … It thus is apparent that counsel's failure to expand their investigation 'resulted from inattention, not reasoned strategic judgment.' [Wiggins, 539 U.S.] at 526, 123 S.Ct. at 2537."); Williams v. Taylor, 529 U.S. 362, 398 (2000) ("[T]he graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability."); Simmons v. Luebbers, 299 F.3d 929, 939 (8th Cir. 2002) ("[A] vivid description of Simmons poverty stricken childhood, particularly the physical abuse … may have influenced the jury's assessment of his moral culpability.").

We agree with the circuit court that there was a "reasonable probability" that the mitigating evidence that counsel failed to present might have influenced at least one juror to vote to recommend a sentence of life imprisonment and not death. See Wiggins v. Smith, 539 U.S. at

534. The circuit court's ruling was not clearly erroneous, and the State is due no relief on this claim.

### II. Mack's Cross-Appeal

Mack argues in his cross-appeal that the circuit court erred in denying his claim that his sentence of death is unconstitutional because the jury did not make a factual determination on whether the aggravating circumstances outweighed the mitigating circumstances. Specifically, he argues that, based on the United States Supreme Court rulings in Hurst v. Florida, 577 U.S. 92 (2016), and Ring v. Arizona, 536 U.S. 584 (200), the jury was required to make a finding of fact on the facts that would support a sentence of death.

Before the hearing on the postconviction petition, the circuit court found that this claim was without merit and stated: "The Alabama Supreme Court has rejected claims that Alabama's capital sentencing system is unconstitutional in light of Hurst v. Florida, 577 U.S. 92 (2016)." (C. 7371-72.)

First, this Court has affirmed the circuit court's ruling setting aside Mack's sentence of death and granting Mack a new sentencing hearing; therefore, any relief on the claim that the jury did not make findings of

fact on the aggravating circumstances and the mitigating circumstances is moot.

Nonetheless, the Alabama Supreme Court has addressed this claim:

> "Our reading of Apprendi [v. New Jersey, 530 U.S. 466 (2000)], Ring [v. Arizona, 536 U.S. 584 (2002)], and Hurst [v. Florida, 577 U.S. 92 (2016),] leads us to the conclusion that Alabama's capital-sentencing scheme is consistent with the Sixth Amendment. As previously recognized, Apprendi holds that any fact that elevates a defendant's sentence above the range established by a jury's verdict must be determined by the jury. Ring holds that the Sixth Amendment right to a jury trial requires that a jury 'find an aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 585. Hurst applies Ring and reiterates that a jury, not a judge, must find the existence of an aggravating factor to make a defendant death-eligible. Ring and Hurst require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty -- the plain language in those cases requires nothing more and nothing less. Accordingly, because in Alabama a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment."

Ex parte Bohannon, 222 So. 3d 525, 532-33 (Ala. 2016).

### Conclusion

For the foregoing reasons, we affirm the circuit court's order granting, in part, Mack's postconviction petition and setting aside Mack's

sentence of death. We dismiss as moot Mack's appeal challenging the constitutionality of his sentence of death.

APPEAL -- AFFIRMED.

CROSS-APPEAL -- DISMISSED.

Cole, J., and Joiner, Special Judge,* concur. Windom, P.J., dissents. McCool, J., dissents, with opinion. Minor, J., recuses himself.

---

*Retired Judge J. Michael Joiner was appointed on August 9, 2024, to be a special judge in regard to this appeal. See § 12-3-7, Ala. Code 1975.

McCOOL, Judge, dissenting.

Pursuant to Strickland v. Washington, 466 U.S. 668 (1984), a defendant who seeks relief on an ineffective-assistance-of-counsel claim must prove both that his counsel's performance was deficient and that he was prejudiced by the deficient performance. Failure to prove either prong of the Strickland test will preclude the defendant from obtaining relief; failure to prove both prongs certainly will. Hutcherson v. State, 243 So. 3d 855, 864 (Ala. Crim. App. 2017).

In this case, Albert Mack III filed a Rule 32, Ala. R. Crim. P., petition for postconviction relief in which he alleged that he received ineffective assistance from his trial counsel, Wayne Williams and John Sutton, during the penalty phase of his 1995 capital-murder trial, in which he was sentenced to death for murdering Patrick Holman. The Tuscaloosa Circuit Court granted relief on that claim and vacated Mack's death sentence, and a majority of this Court has now affirmed that ruling. However, Mack failed to prove either that Williams and Sutton performed deficiently or, assuming deficient performance, that he suffered any prejudice. Thus, the circuit court should not have granted relief on Mack's ineffective-assistance-of-counsel claim, and this Court

56

should therefore reverse that ruling. Because the majority affirms the ruling, I must respectfully dissent.

Deficient Performance

The record in this case indicates that Williams and Sutton considered two potential strategies for attempting to mitigate Mack's sentence for his capital-murder conviction. On the one hand, Williams and Sutton could have presented evidence indicating that Mack unquestionably had a difficult childhood marred by extreme poverty and an alcoholic father who physically abused Mack, Mack's sisters, and Mack's mother. However, that strategy would have carried significant risk because Mack also has a checkered past that includes violent criminal conduct. Specifically, Mack "served 110 days" for "child abuse" in California in 1988 (C. 7895), pleaded guilty to "assault with a deadly weapon" in California in 1989 (id.), "s[old] and use[d] drugs extensively" while enlisted in the United States Marine Corps (C. 7898), and was "separated from the [Marine Corps] for unauthorized absences and striking [an officer] while intoxicated." (C. 7899.) Thus, presenting evidence of Mack's difficult childhood would have risked opening the door for the State to present damning evidence from Mack's background. See

Washington v. State, 95 So. 3d 26, 53 (Ala. Crim. App. 2012) (noting that defense counsel does not perform deficiently by "not present[ing] mitigation testimony during the penalty phase that could open the door to other damaging testimony"); and Carter v. Mitchell, 443 F.3d 517, 532 (6th Cir. 2006) (noting that it is reasonable "to limit testimony about [defendant]'s past in order to prevent 'opening-the-door' to evidence of [defendant]'s criminal background").

Instead of focusing on Mack's difficult childhood, Williams and Sutton chose to focus on the significant contributions that Mack had made to society while awaiting trial in the Tuscaloosa County jail. Specifically, Williams and Sutton presented evidence indicating that Mack had volunteered to participate in a program in which juveniles who "seem[ed] to want to cross" into criminal activity would "tour … the jail facility and [be] expose[d] to what could happen if they chose that path" (CR-95-1226, R. 1210); that the program was "a success" that could be "attribute[d] … a lot to [Mack]" (id., R. 1211); that Mack had spoken to "[o]ver 1,000" juveniles in conjunction with that program (id., R. 1218) and that "school officials [had] specifically ask[ed] to have [Mack] talk to … maybe high-risk students or students they would like to expose to what

58

life might be should they end up on the wrong side of the fence as far as criminal actions" (id., R. 1221); that the Tuscaloosa County Sheriff's Department had received telephone calls from parents in the community who "can't do anything with their kids" and wanted Mack to speak to them (id., R. 1243) and that "even law enforcement people bring their problem … people by to talk to Mack" (id., R. 1245); that the Sheriff's Department had received "very positive comments in regard to the recidivism as far as people that have had contact or discussions with Mack" (id., R. 1222); that Mack had told the chief of jail operations that he "wanted to continue to meet with the groups" "no matter what the outcome of the trial was" (id., R. 1242) -- a claim the chief found to be sincere; that Mack's positive influence was not limited to juveniles but had extended to "church groups[,] the media, YMCA men's club, [and] Leadership Tuscaloosa, which is a program from the Chamber of Commerce" (id., R. 1219); that Mack had "agree[d] to make a video which is used in a gang presentation at the Law Enforcement Academy," in which Mack provided "helpful things that officers would need to know in interviewing gang members or identifying gang members and things like that" (id., R. 1223); that Mack had reported a security breach at the jail

59

and had agreed to "assist … in stopping this breach," despite significant risk to himself (id., R. 1230); and that Mack had expressed remorse for killing Holman. That strategy was also not without risk, though, as it opened the door for the State to present evidence indicating that Mack had been involved in several physical altercations while in the jail.

The fact that Williams and Sutton chose one of these strategies over the other is not evidence that they performed deficiently. Indeed, I doubt that either the majority or the circuit court would disagree with that statement, as this Court has previously acknowledged that defense counsel "'"'is afforded broad authority in determining what evidence will be offered in mitigation'"'" and "'"'must be permitted to weed out some arguments to stress others and advocate effectively.'"'" McWhorter v. State, 142 So. 3d 1195, 1246 (Ala. Crim. App. 2011) (citations omitted). Instead, the dispositive question in this case is whether Williams and Sutton's investigation into Mack's background provided them with enough information to make an informed decision to choose one strategy over the other. See Ray v. State, 80 So. 3d 965, 983 (Ala. Crim. App. 2011) ("'[O]ur principal concern in deciding whether [counsel] exercised "reasonable professional judgmen[t]" is … whether the investigation

supporting counsel's decision … <u>was itself reasonable</u>.'" (quoting <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003))).

Regarding this issue,

"the United States Supreme Court [has] stated:

"'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'

"<u>Strickland [v. Washington]</u>, 466 U.S. [668,] 690-91 [(1984)]."

<u>McWhorter</u>, 142 So. 3d at 1230. This Court

"'"has distinguished between counsel's complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an adequate investigation[,] where the presumption of reasonable performance is more difficult to overcome:

61

> > """'[T]he cases where this court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have <u>totally failed</u> to conduct such an investigation. In contrast, if a … claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the <u>degree</u> of his attorney's investigation, the presumption of reasonableness imposed by <u>Strickland</u> will be hard to overcome.'

> > """<u>Campbell v. Coyle</u>, 260 F.3d 531, 552 (6th Cir. 2001) (quotation omitted); <u>see also</u> <u>Moore v. Parker</u>, 425 F.3d 250, 255 (6th Cir. 2005). …."

> "'<u>Beuke v. Houk</u>, 537 F.3d 618, 643 (6th Cir. 2008). … "A defense attorney is not required to investigate all leads ...." <u>Bolender v. Singletary</u>, 16 F.3d 1547, 1557 (11th Cir. 1994). "A lawyer can almost always do something more in every case. But the Constitution requires a good deal less than maximum performance." <u>Atkins v. Singletary</u>, 965 F.2d 952, 960 (11th Cir. 1992). "The attorney's decision not to investigate must not be evaluated with the benefit of hindsight, but accorded a strong presumption of reasonableness." <u>Mitchell v. Kemp</u>, 762 F.2d 886, 889 (11th Cir. 1985).

"'"…."

"'… "The reasonableness of the investigation involves 'not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.'" St. Aubin v. Quarterman, 470 F.3d 1096, 1101 (5th Cir. 2006), quoting in part Wiggins [v. Smith], 539 U.S. [510,] 527 [(2003)].'

"Ray [v. State], 80 So. 3d [965,] 984 [(Ala. Crim. App. 2011)]."

McWhorter, 142 So. 3d at 1245-46 (emphasis added).

In short, a full and exhaustive mitigation investigation is not a constitutional requirement, and a limited investigation does not constitute deficient performance if defense counsel has "performed an adequate enough investigation to make an informed and educated decision" that further investigation is unnecessary. State v. Smith, 85 So. 3d 1063, 1082 (Ala. Crim. App. 2010). See Lewis v. Dretke, 355 F.3d 364, 367 (5th Cir. 2003) ("A limited investigation into mitigating evidence may be reasonable … if counsel has a basis for believing that further investigation would be counterproductive or fruitless."). Indeed, "Strickland itself rejected the notion that the same investigation will be required in every case." Cullen v. Pinholster, 563 U.S. 170, 195 (2011).

See In re Andrews, 28 Cal. 4th 1234, 1254, 52 P.3d 656, 668, 124 Cal.

Rptr. 2d 473, 487 (2002) ("In Strickland, the Supreme Court specifically

addressed counsel's duty to investigate and made clear courts should not

equate effective assistance with exhaustive investigation of potential

mitigating evidence."); and Johnson v. Secretary, DOC, 643 F.3d 907, 931

(11th Cir. 2011) ("The question under Strickland is … whether [counsel]

conducted an adequate background investigation or reasonably decided

to end the background investigation when he did." (emphasis added)).

In this case, the circuit court found that Williams and Sutton "failed

to conduct a reasonable mitigation investigation" (C. 7686) and that, as

a result, they

> "were unaware of many of the key facts about Mack's life,
> including the poverty and instability that pervaded his
> childhood, the nature and severity of the abuse he suffered at
> the hands of his father, the violence he witnessed between his
> parents, and the instances in which he tried to help other
> people and protect them from abuse."

(C. 7684.) Thus, the circuit court concluded that, because Williams and

Sutton "did not know what evidence was available to present about

Mack's life," they "were not in any position to make a reasonable strategic

decision about what [mitigating evidence] to present." (C. 7686.)

However, contrary to the majority's holding, the circuit court's finding that Williams and Sutton "did not know what evidence was available to present about Mack's life" is not supported by the record. Sutton testified at the Rule 32 hearing that Mack had "openly discussed his childhood and his family" and "his criminal history" during the initial meeting with his counsel (R. 109), which occurred more than two years before Mack's trial, and the circuit court acknowledged that Williams and Sutton had "learned about the abuse in general terms." (C. 7692.) In fact, Mack himself conceded in his petition that Williams and Sutton had been "aware that [he] had suffered severe physical and emotional abuse as a child." (C. 573.) Thus, it is undisputed that Williams and Sutton were aware of Mack's difficult childhood long before Mack's trial began.

The reason the circuit court granted Mack relief, despite the fact that Williams and Sutton were aware of Mack's difficult childhood, is that the court found that Williams and Sutton had not conducted any further investigation into Mack's background following their discussions with him. Those discussions, the circuit court reasoned, should have prompted Williams and Sutton to further investigate Mack's background. The majority likewise holds that Williams and Sutton's discussions with

65

Mack "should have alerted [them] to conduct a more extensive investigation into Mack's childhood and background." ___ So. 3d at ___. However, discussions with a defendant about his background are a crucial step in a mitigation investigation, and such discussions often provide defense counsel with valuable, firsthand information about the defendant's background that may suggest to counsel that further investigation is unnecessary. As the United States Supreme Court has explained:

> "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions."

Strickland, 466 U.S. at 691 (emphasis added). Thus, the circuit court and the majority fault Williams and Sutton for not further investigating Mack's background following their discussions with him, but Strickland unequivocally provides that those discussions, in and of themselves, could have provided Williams and Sutton with a sufficient basis for not conducting any further investigation.

That said, I recognize that the circuit court found that Williams and Sutton's investigation was "limited" and not "meaningful" (C. 7684, 7689), which indicates that the court did not believe their discussions with Mack had provided them with enough information to reasonably conclude that further investigation was unnecessary. The majority likewise concludes that Williams and Sutton "'acquired only [a] rudimentary knowledge of [Mack's] history.'" ___ So. 3d at ___ (quoting Wiggins v. Smith, 539 U.S. 510, 524 (2003)). However, it is not clear from the record that Williams and Sutton's knowledge of Mack's background was less detailed than the evidence Mack presented at the Rule 32 hearing. To be sure, Mack's Rule 32 counsel elicited Williams's and Sutton's testimony that they did not obtain certain background records and did not interview Mack's teachers, coaches, classmates, neighbors,

social workers, or fellow Marines. What Mack's Rule 32 counsel did not do, though, was ask Williams and Sutton to explain what information they had obtained from Mack himself, and, absent evidence to the contrary, it requires pure speculation, and relieves Mack of his burden of proof, to conclude that the information Williams and Sutton obtained from Mack was less detailed than the information they could have obtained from other sources, especially given that Mack "openly discussed his childhood and his family" with his counsel. Because it was Mack's burden to prove that Williams and Sutton conducted an unreasonable mitigation investigation, Bui v. State, 717 So. 2d 6, 12 (Ala. Crim. App. 1997), the circuit court should have found this lack of clarity to weigh against Mack, not in his favor. See Lang v. Bobby, 889 F.3d 803, 815 (6th Cir. 2018) (noting that it is the defendant's burden "to show that his counsel made decisions without adequate knowledge").

Regardless, even if Williams and Sutton did not have a complete picture of Mack's difficult childhood, the fact remains that this is not a case in which defense counsel failed to conduct any investigation into the defendant's background. Indeed, neither Mack nor the circuit court has disputed that Williams and Sutton were at least generally aware of

68

Mack's difficult childhood. Instead, this is a case in which defense counsel did not investigate the defendant's background any further, after obtaining at least some knowledge of both his difficult childhood and his checkered past, because counsel decided to focus their mitigation efforts on the defendant's conduct in jail, rather than risk opening the door to that checkered past. Other courts, including the United States Supreme Court, have held that a limited investigation into the defendant's background was reasonable in similar situations. Burger v. Kemp, 483 U.S. 776 (1987), is particularly instructive.

In Burger, there was evidence available that "would have disclosed that [defense counsel's client, Christopher Burger,] had an exceptionally unhappy and unstable childhood," 483 U.S. at 789, and counsel "was aware of some, but not all, of this family history prior to [Burger's] trial." Id. at 790. However, defense counsel "did not mount an all-out investigation into [Burger's] background," id. at 794, because he determined "that his client's interest would not be served by presenting this type of evidence." Id. at 791. In addition, defense counsel "offered no mitigating evidence at all" at the sentencing hearing. Id. at 788.

69

Despite defense counsel's limited investigation and the fact that he presented no mitigating evidence whatsoever, the United States Supreme Court held that there had been no ineffective assistance. In support of its holding, the Court noted that, if defense counsel had presented evidence of Burger's "troubled family background," then counsel risked "introducing facts not disclosed by [Burger's] clean adult criminal record" -- specifically, that Burger had "got[ten] into trouble and [been] on juvenile probation," that he had "got[ten] involved with drugs," and that he had "violent tendencies," including "a hairtrigger temper" that would sometimes cause him to "get mad and punch the walls." 483 U.S. at 793-94. Those facts, the Court noted, could have minimized any "sympathy … over [Burger's] tragic childhood" that the jury might have felt. Id. at 794. In other words, as the Court would later explain in Wiggins v. Smith, 539 U.S. 510, 535 (2003), Burger involved "the double edge [that the Court has] found to justify limited investigations," i.e., the existence of mitigating evidence from the defendant's background that, if presented, could open the door to damning evidence from his background.

Based on the foregoing, the Burger Court explained that, although defense counsel "could well have made a more thorough investigation

70

than he did," his "decision not to mount an all-out investigation into [Burger's] background in search of mitigating circumstances was supported by reasonable professional judgment." 483 U.S. at 794. Thus, as the California Supreme Court has observed, <u>Burger</u> makes clear, as do other cases from the United States Supreme Court, that "valid strategic choices are possible even without extensive investigative efforts." <u>In re Andrews</u>, 28 Cal. 4th at 1254, 52 P.3d at 668, 124 Cal. Rptr. 2d at 488. <u>See also</u> <u>Rompilla v. Beard</u>, 545 U.S. 374, 383 (2005) ("[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."); and <u>Strickland</u>, 466 U.S. at 673 (holding that defense counsel performed reasonably, despite the fact that he chose "not to look further for evidence concerning [the defendant's] character" and instead chose to pursue a mitigation strategy that did not focus on the defendant's background).

The facts of this case are even further from a finding of deficient performance than the facts of <u>Burger</u>. In each case, defense counsel was aware of at least some aspects of the defendant's difficult childhood but did not conduct an exhaustive investigation into his background. There was also damning evidence in each defendant's background that made it

71

risky for defense counsel to present mitigating evidence from his background. However, the damning evidence in Mack's background -- assault with a deadly weapon, child abuse, the extensive use and sale of illegal drugs, and a dishonorable discharge from the Marine Corps for physically attacking an officer -- is far more serious than the damning evidence in Burger's background, which included some involvement with illegal drugs, juvenile probation, and a "temper" that would sometimes cause him to "get mad and punch the walls." 483 U.S. at 794. In addition, Burger's counsel presented no mitigating evidence at all, whereas Williams and Sutton presented substantial and compelling mitigating evidence on Mack's behalf. Thus, if defense counsel's performance in Burger was not deficient, I fail to see how Williams and Sutton's performance was deficient; indeed, I find the majority's decision to be in direct conflict with that case.

Allen v. State, 749 N.E.2d 1158 (Ind. 2001), and Reed v. State, 875 So. 2d 415 (Fla. 2004), are also instructive. In Allen, the Indiana Supreme Court held that it was reasonable for defense counsel not to present evidence regarding "the difficult conditions of [Howard Allen's] childhood," including the physical abuse he suffered at a boys' school,

72

because such evidence could have "open[ed] the door to [Allen's] criminal record." 749 N.E.2d at 1173. Defense counsel was particularly concerned about keeping Allen's prior manslaughter conviction out of evidence because "the facts of that case resembled the murder" for which Allen had been sentenced to death. Id. at 1172. Allen argued, though, that "even if trial counsel made [a] strategic choice[ ] not to present [the background] evidence, counsel did not make sufficient investigation to support [that] strategic choice." Id. at 1175. The Court rejected that argument, noting that defense counsel "had a working knowledge of some of the mitigation evidence" from the defendant's background. Id. at 1176. Thus, the Court explained that, given defense counsel's "working knowledge" of that evidence,

> "[i]t was counsel's role to balance the value of this evidence with the damage that the prior convictions would inflict. In light of the adverse effect that evidence of similar crimes against similar victims could have on a jury, counsel acted reasonably in striking a cautious balance towards Allen's criminal history."

Id.

In Reed, defense counsel did not present any mitigating evidence on Grover Reed's behalf, and, in his petition for postconviction relief, Reed argued that his counsel "should have investigated, developed, and

73

presented a strong body of mitigating evidence," including his "family background," to which his brother and sister testified at the postconviction hearing. 875 So. 2d at 435. Defense counsel testified that he had not interviewed Reed's family because Reed had stated that he "did not want them involved in his trial," id. at 435, but counsel had "clearly investigated or was aware of Reed's background … to an extent" because a presentence investigative report "contained much," but apparently not all, "of the information testified to by Reed's brother and sister." Id. at 436 (emphasis added). However, the Florida Supreme Court explained that Reed's "family background" "present[ed] a double-edged sword" in that it "involved numerous facts that placed Reed in a very negative light," id. at 437, which meant that "the testimony that could have been presented was just as likely to have resulted in aggravation … rather than mitigation." Id. at 436-37. In fact, the Court explained that presenting mitigating evidence from Reed's background could have been "particularly disadvantageous" because there were violent events in his past that were similar to his crime, which "would have opened the door for the State to draw a parallel between" Reed's violent past and his violent crime. Id. at 437. Thus, despite the fact that

defense counsel did not conduct an exhaustive investigation into Reed's background and did not present any mitigating evidence at all, the Court held that counsel had not performed deficiently.

Like defense counsel in Allen and Reed, Williams and Sutton had what can be characterized as, at the very least, a "working knowledge" of Mack's difficult childhood, Allen, 749 N.E.2d at 1176, or, put differently, they were aware of Mack's difficult childhood at least "to an extent." Reed, 875 So. 2d at 436. Indeed, it is undisputed that Williams and Sutton were at least generally aware of Mack's difficult childhood, and, as I have already explained, Mack failed to carry his burden of proving that his counsel did not have a detailed picture of his childhood. Compare Ploof v. State, 75 A.3d 840, 855 (Del. 2013) (holding that, as a result of defense counsel's limited investigation, "she never knew about the child abuse evidence, and therefore could not have tactically decided to focus on [the defendant's] military service"); and Ex parte Gonzales, 204 S.W.3d 391, 396 (Tex. Crim. App. 2006) (holding that, as a result of defense counsel's limited investigation, he "was not aware … that the [defendant] suffered an abusive childhood"). However, Williams and Sutton were also aware that Mack's background contains the "double-

edged sword" that would have made it risky to present mitigating evidence from his background. Reed, 875 So. 2d at 437. And, as was the case in Allen and Reed, opening the door to Mack's checkered past was particularly risky because Mack's assault-with-a-deadly-weapon conviction appears to have involved facts that are strikingly similar to the facts of Holman's murder -- in both cases, Mack was on friendly terms with the victim when a dispute about drug money arose, and, while in a car with the victim, Mack shot the victim in the head, apparently without warning or provocation, because he allegedly feared that the victim was going to kill him (C. 7900, 7907-08) -- which would have allowed the State to argue that Mack's murder of Holman was simply a pattern of criminal behavior. In addition, Williams and Sutton presented substantial and compelling mitigating evidence on Mack's behalf, unlike defense counsel in Reed (and Burger), who presented no mitigating evidence whatsoever.

I find this case to be similar to Burger, Allen, and Reed, which all support the conclusion that Williams and Sutton did not perform deficiently by choosing not to conduct an exhaustive investigation into Mack's background. The majority and the circuit court, on the other

hand, find this case to be similar to <u>Wiggins</u>, <u>supra</u>. However, <u>Wiggins</u> is easily distinguishable.

In <u>Wiggins</u>, Kevin Wiggins argued that his counsel provided ineffective assistance by "failing to investigate and present mitigating evidence of his dysfunctional background" during the penalty phase of his capital-murder trial. 539 U.S. at 516. Defense counsel "knew of Wiggins'[s] unfortunate childhood," <u>id.</u> at 518, based on their review of a one-page presentence investigation report, which noted Wiggins's "misery as a youth" and "his description of his own background as 'disgusting,'" <u>id.</u> at 523, and their review of records they obtained from the Department of Social Services, which "revealed several facts: [Wiggins's] mother was a chronic alcoholic; Wiggins was shuttled from foster home to foster home and displayed some emotional difficulties while there; he had frequent, lengthy absences from school; and, on at least one occasion, his mother left him and his siblings alone for days without food." <u>Id.</u> at 525. However, the information from those sources "was neither as detailed nor as graphic" as the evidence presented at the postconviction hearing, <u>id.</u> at 518, which indicated that Wiggins had suffered "severe physical and sexual abuse" as a child. <u>Id.</u> at 516. In fact,

it appears that, although defense counsel knew that Wiggins's childhood had been "disgusting," they had no knowledge whatsoever about the physical and sexual abuse. See id. at 528 (noting that, contrary to the lower court's finding, Wiggins's social-services records "contain[e]d no mention of [the] abuse").

The United States Supreme Court held that defense counsel had performed deficiently because they had "abandoned their investigation of [Wiggins's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. According to the Court, the limited information defense counsel had discovered in Wiggins's social-services records should have prompted counsel to investigate Wiggins's background further, which would have alerted them to the severe abuse Wiggins had suffered. That was especially true, the Court explained, given that Wiggins "d[id] not have a record of violent conduct that could have been introduced by the State to offset this powerful mitigating narrative," id. at 537 (emphasis added) -- a fact that, the Court noted, "distinguish[ed] [Wiggins's] case from [the Court's] precedents in which [it has] found limited investigations into mitigating evidence to be reasonable," such as Burger. 539 U.S. at 525

(citing Burger).  The Court also noted that the unreasonableness of defense counsels' investigation was underscored by the fact that counsel "put on a halfhearted mitigation case," which "suggest[ed] that their failure to investigate thoroughly resulted from inattention, not reasoned judgment."  539 U.S. at 526.

Several facts distinguish this case from Wiggins.  First, as I have already explained, it is not clear that Williams and Sutton had a "rudimentary knowledge" of Mack's background because Mack failed to prove what information they had obtained about his background during their discussions with him.  539 U.S. at 524.  In fact, I note that, although Wiggins's counsel almost certainly discussed his case with him, there is no indication that they ever spoke with him specifically about his background.  Regardless, it is undisputed that Williams and Sutton were at least generally aware that Mack had suffered an abusive childhood, so they knew what type of evidence they might find if they were to further investigate his background and were able to weigh the benefit of such evidence against the risk of opening the door to his checkered past.  That was not the case in Wiggins, where defense counsel had no knowledge whatsoever of the abuse Wiggins suffered and thus could not have

weighed the value of such mitigating evidence against any accompanying risk. That brings me to the second distinguishing fact, which is that there was no such risk for Wiggins's counsel, "given the apparent absence of aggravating factors from Wiggins'[s] background." Id. at 525. Mack, on the other hand, does have "aggravating factors" in his background, id., and the Wiggins Court unequivocally explained that the existence of such factors in Wiggins's background, had there been any, could have justified his counsels' decision to cut short their investigation. Third, unlike Wiggins's counsel, Williams and Sutton did not "put on a halfhearted mitigation case," id. at 526; rather, they presented substantial and compelling mitigating evidence on Mack's behalf. Those facts make it clear to my mind that this case is distinguishable from Wiggins and is more in line with Burger.

It is also clear to me that this case is distinguishable from State v. Lewis, 371 So. 3d 863 (Ala. Crim. App. 2022), which the circuit court found to be "particularly instructive." (C. 7687.) In Lewis, defense counsel presented brief testimony from the investigator they had hired to "look into [the defendant's] background," and that testimony indicated that the defendant had been "raised in a home in which there was some

abuse." 371 So. 3d at 900. However, there were "numerous witnesses" who could have testified in detail about the defendant's "difficult upbringing and his abusive stepfather," id., as well as "[n]umerous DHR records" that reflected the abuse, id. at 902, but the investigator, who was hired five weeks before trial, "was hired too late to conduct an extensive mitigation investigation or to uncover the mitigation that was presented at the [Rule 32] hearing." Id. at 903. Thus, this Court noted that "[o]nly a perfunctory investigation of mitigation evidence … and only a meager portion of mitigation evidence was presented at sentencing," and the Court affirmed the circuit court's ruling that defense counsel had provided ineffective assistance of counsel. Id.

This case is similar to Lewis in one respect, which is that Williams and Sutton hired their mitigation investigator, Raymond Sumrall, at a point that was arguably too late to allow him to conduct "an extensive mitigation investigation or to uncover the mitigation that was presented at the [Rule 32] hearing." 371 So. 3d at 903. However, Williams and Sutton conducted some important mitigation investigation themselves early in the proceedings by discussing Mack's background with him, and I reiterate and emphasize that Mack, who "openly discussed his

childhood and his family" with his counsel, failed to carry his burden of proving that Williams and Sutton did not obtain a detailed picture of his background during those discussions. That was not the case in <u>Lewis</u>, in which defense counsel did not conduct <u>any</u> mitigation investigation themselves and failed to do so because of a lack of communication between them. <u>Id.</u> at 891 (noting that one of the defendant's attorneys believed that the other attorney was "handling the penalty phase" but that the latter had done "nothing to prepare for the penalty phase"). Furthermore, the little mitigating evidence that defense counsel did present in <u>Lewis</u> indicated that the defendant had suffered an abusive childhood. Thus, "acquiring additional mitigating evidence would have been consistent with the penalty phase strategy that counsel ultimately adopted," which provided counsel with "every incentive to develop the strongest mitigation case possible." <u>Williams v. Allen</u>, 542 F.3d 1326, 1340 (11th Cir. 2008). That is not the case here, where Williams and Sutton chose a mitigation strategy that did <u>not</u> focus on Mack's background. Finally, there is no indication that the defendant in <u>Lewis</u> had any prior criminal history or other damning evidence in his past, so, like Wiggins's counsel, and unlike Williams and Sutton, it does not

82

appear that defense counsel in that case was faced with the "the double edge [that has been] found to justify limited investigations." Wiggins, 539 U.S. at 535.

Several other points about the circuit court's conclusions also warrant mention. First, I recognize that the circuit court rejected Williams's testimony regarding his subjective mental operation, i.e., that he had made a strategic decision regarding what mitigating evidence to present. However, "deficient performance is an objective inquiry," which "mean[s] that even if trial counsel acted out of inexperience or neglect, his actions would still not constitute ineffective assistance of counsel if we can say that a reasonable attorney could have acted as he did." Jefferson v. GDCP Warden, 941 F.3d 452, 480 (11th Cir. 2019) (emphasis added). In other words, even when a circuit court does not "'characteriz[e] certain actions as strategic ..., the pertinent question under the first prong of Strickland remains whether, after considering all the circumstances of the case, the attorney's representation was objectively unreasonable.'" United States v. Babock, 40 F.4th 1172, 1177 (10th Cir. 2022) (emphasis added; citation omitted). See also Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008) ("[I]t matters not

whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight. The relevant question is not what <u>actually</u> motivated counsel, but what reasonably <u>could have</u> motivated counsel." (emphasis added)); and <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 481 (2000) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."). Thus, the circuit court's primary concern should not have been whether Williams <u>actually</u> made a strategic choice with respect to his mitigation strategy but, instead, should have been whether a reasonable attorney in his position <u>could have made</u> the strategic choice that he testified he made. If Williams and Sutton's mitigation investigation and ultimate mitigation strategy were <u>objectively</u> reasonable, and they were, then Mack was not provided with ineffective assistance of counsel, regardless of his counsels' subjective intentions.

Second, in finding that Williams's testimony about his strategy was not credible, the circuit court noted Williams's testimony that he had chosen "not to present life-history evidence" (C. 7689) because "he would not have wanted the jury to hear about Mack's prior criminal history." (C. 7685.) The circuit court noted, though, that Williams "could not

remember whether he presented Sumrall's report, which included some information about Mack's family life, to the jury" (C. 7690); that Williams "mentioned Mack's prior conviction to the jury in his opening statement at the penalty phase" (C. 7685); and that Williams "began the defense's penalty-phase case by calling a California parole officer" (C. 7690), whose testimony indicated that Mack had been convicted of assault with a deadly weapon in California.

Viewed objectively, it would be unreasonable for defense counsel to limit his investigation of the defendant's difficult childhood when counsel's mitigation strategy is to present evidence to that effect. If defense counsel's "sentencing case focuse[s] on establishing that [the defendant] had a troubled background, [then] [counsel] ha[s] every incentive to develop the strongest mitigation case possible." Williams, 542 F.3d at 1340. It would also be unreasonable for defense counsel to choose not to present mitigating evidence from the defendant's background, in an attempt to prevent the jury from hearing the defendant's criminal history, and then take it upon himself to present that criminal history to the jury.

However, neither of those situations occurred here. The transcript of the sentencing hearing, which the circuit court stated it had reviewed, indicates that Williams did not present Sumrall's report to the jury, so Williams did not in fact present any mitigating evidence from Mack's background. It is true that Williams acknowledged Mack's assault-with-a-deadly-weapon conviction during his opening statement, and it is true that Williams's first witness was a California parole officer whose testimony indicated that Mack had been convicted of assault with a deadly weapon in California. However, the State had already mentioned Mack's assault-with-a-deadly-weapon conviction in its opening statement and had already called the parole officer to testify, and it is clear from the record that Williams recalled the officer in an attempt to soften the impact of that conviction by eliciting the officer's testimony that the victim of that offense did not believe Mack should be punished severely. Thus, although Williams acknowledged Mack's assault-with-a-deadly-weapon conviction before the jury, this is not a case where defense counsel introduced the defendant's criminal history himself.

Third, the circuit court made much of the fact that Williams and Sutton hired Sumrall approximately one week before Mack's trial began,

which, according to the court, gave Sumrall "no time to uncover the mitigating evidence that was presented at the [Rule 32] hearing." (C. 7688.) However, although the late hiring of an investigator might be a significant fact in some cases, see, e.g., Lewis, supra, it is not dispositive. Indeed, in McWhorter, supra, this Court affirmed the circuit court's finding that defense counsel's mitigation investigation was reasonable even though counsel did not hire an investigator at all and, instead, chose to conduct the investigation himself through discussions with the defendant and his family. Here, the fact that Sumrall might not have had time to conduct an exhaustive background investigation is not significant because Williams and Sutton were aware of Mack's difficult childhood early in the proceedings, based on their discussions with him, and ultimately decided to pursue a different mitigation strategy that did not focus on his background. Thus, the circuit court appears to have ignored the fact that an exhaustive investigation into Mack's background would have been unnecessary -- and even counterproductive, as a waste of time -- if evidence from his background was not going to be presented anyway. See Chandler v. United States, 218 F.3d 1305, 1314 n.14 (11th Cir. 2000) ("[C]ourts must recognize that counsel does not enjoy the

benefit of unlimited time and resources. Every counsel is faced with a zero-sum calculation on time, resources, and defenses to pursue at trial." (citation omitted)).

Finally, I note that the circuit court based its ruling in part on the fact that neither Williams nor Sutton had ever previously served as defense counsel in a capital-murder trial. However, although defense counsel's inexperience may be a factor to consider, " '[t]he dispositive facts upon which an ineffective assistance claim succeeds or fails centers on counsel's performance, not the level of his or her experience.' " Gaddy v. State, 952 So. 2d 1149, 1156 (Ala. Crim. App. 2006) (quoting Aragon v. State, 114 Idaho 758, 761, 760 P.2d 1174, 1177 (1988)). "An attorney can render effective assistance of counsel even if he has had no prior experience in criminal advocacy." United States v. Lewis, 786 F.2d 1278, 1281 (5th Cir. 1986). See also Jefferson, 941 F.3d at 480 ("[E]ven if trial counsel acted out of inexperience or neglect, his actions would still not constitute ineffective assistance of counsel if we can say that a reasonable attorney could have acted as he did."). As Burger, Allen, and Reed make clear, a reasonable attorney in Williams and Sutton's position, even an attorney seasoned in capital-murder defense, could have made the

decision not to investigate Mack's background any further based on the information that their investigation had already revealed. In fact, the <u>Burger</u> Court made a point of noting that defense counsel in that case had previously tried a dozen capital-murder cases and was "thoroughly familiar with practice and sentencing juries in the local community," yet he made the same decision that Williams and Sutton made in this case. 483 U.S. at 780.

I conclude my analysis on the performance prong of the <u>Strickland</u> test where I began, by reiterating that, when an ineffective-assistance-of-counsel claim "'"'does not involve a <u>failure</u> to investigate but, rather, [the defendant's] dissatisfaction with the <u>degree</u> of his attorney's investigation,'"'" then "'"'the presumption of reasonableness imposed by <u>Strickland</u> will be hard to overcome.'"'" <u>McWhorter</u>, 142 So. 3d at 1245 (citations omitted). <u>See</u> <u>Puiatti v. Secretary, Florida Dep't of Corr.</u>, 732 F.3d 1255, 1280 (11th Cir. 2013) ("[A] decision to limit investigation is 'accorded a strong presumption of reasonableness.'" (quoting <u>Mills v. Singletary</u>, 63 F.3d 999, 1021 (11th Cir. 1995))). Here, it is undisputed that Williams and Sutton were at least generally aware that Mack experienced a difficult childhood -- indeed, Mack conceded that Williams

and Sutton were aware that he had "suffered severe physical and emotional abuse as a child" -- and were aware that he also has a checkered past that includes violent criminal conduct. Thus, even assuming that Williams and Sutton had only a general awareness of Mack's difficult childhood, there was a basis upon which a reasonable attorney could have determined that further investigation into Mack's background was unnecessary because presenting evidence from his background would have risked opening the door to his checkered past. The reasonableness of that decision is further supported by the fact that Williams and Sutton had other strong mitigating evidence to present and that they did in fact present substantial and compelling mitigating evidence on Mack's behalf; indeed, two jurors were apparently swayed by the mitigating evidence because they voted for a sentence of life imprisonment without the possibility of parole.

I recognize that, by choosing a mitigation strategy that focused on Mack's conduct in jail, Williams and Sutton also opened the door to some negative evidence -- namely, Mack's physical altercations in the jail. However, a reasonable attorney could have concluded that Mack's physical altercations in the jail were not nearly as damning as his

checkered past, which included assault with a deadly weapon, child abuse, the extensive use and sale of illegal drugs, and a dishonorable discharge from the Marine Corps for physically attacking an officer. Plus, because both mitigation strategies carried the risk of exposing negative evidence, the only way for Williams and Sutton to avoid any negative evidence would have been for them to present no mitigating evidence at all. Thus, faced with opening the door to Mack's checkered past, opening the door to his physical alterations in jail, or presenting no mitigating evidence at all, Williams and Sutton struck a reasonable balance by presenting the mitigating evidence that would open the door to the least damning negative evidence.

Of course, another attorney might have chosen to conduct an exhaustive investigation into Mack's background and to present mitigating evidence from his background, despite the risk that would have come with such evidence. That decision would likely also fall within the bounds of reasonable performance, but that is not the standard by which Williams and Sutton's performance is to be judged. "There are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular

client in the same way." Strickland, 466 U.S. at 689. Rather, the pertinent question is whether Williams and Sutton's performance was objectively reasonable, i.e., whether "'some reasonable lawyer' could have pursued the challenged course of conduct," Gissendanner v. Seaboldt, 735 F.3d 1311, 1323 (11th Cir. 2013) (citation omitted), and, as I have explained, and as Burger, Allen, and Reed demonstrate, the answer to that question is "yes."

To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate that his counsel committed "errors so serious that [they] were not functioning as the 'counsel' guaranteed by the Sixth Amendment," Strickland, 466 U.S. at 687, or, stated differently, the defendant must demonstrate that his counsel's representation "amounted to incompetence." Harrington v. Richter, 562 U.S. 86, 105 (2011) (emphasis added). That is not what occurred in this case, where Williams and Sutton were aware of Mack's difficult childhood, realized the risk that came with presenting such evidence, and instead presented substantial and compelling mitigating evidence indicating that Mack has continued to be a positive contributor to society despite his crime. Thus, it is clear to me that Williams and Sutton performed not only adequately,

but actually quite competently, in this case. I would therefore hold that the circuit court erroneously concluded that Williams and Sutton performed deficiently during the penalty phase of Mack's trial.

Prejudice

Furthermore, even if Williams and Sutton did perform deficiently, the circuit court also erred by concluding that Mack was prejudiced by the deficient performance. To prevail on the prejudice prong of the Strickland test, a defendant must establish that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Bui, 717 So. 2d at 13 (emphasis added; citation omitted). Thus, "the prejudice prong of the Strickland test requires … 'something considerably more than the possibility that an unreasonable error by counsel might have had some effect on the trial.'" Bohannon v. State, [Ms. CR-21-0148, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023) (quoting Lyons v. McCotter, 770 F.2d 529, 532 (5th Cir. 1985)) (emphasis added). That does not mean that the defendant must establish "that counsel's actions 'more likely than not altered the outcome,' but the … likelihood of a different result must be

substantial, not just conceivable." Harrington, 562 U.S. at 111-12 (quoting Strickland, 466 U.S. at 693) (emphasis added).

"'"'Prejudicial ineffective assistance of counsel under Strickland cannot be established on the general claim that additional witnesses should have been called in mitigation.'"'" McWhorter, 142 So. 3d at 1247 (citations omitted). Rather, "courts must carefully review [the] omitted mitigation evidence to determine if it truly mitigates or, instead, has the possibility of being a 'two-edged sword.'" Littlejohn v. Royal, 875 F.3d 548, 560 (10th Cir. 2017) (citation omitted). Stated differently, this Court "'must consider not just the [omitted] mitigation evidence ... but also what the prosecution's response to that evidence would have been.'" Id. at 564 (citation omitted).

In this case, the circuit court concluded that the "powerful" and "compelling" evidence Mack presented at the Rule 32 hearing "likely would have swayed" both the jury's and the trial court's sentencing determination. (C. 7707.) This Court would afford "considerable weight" to that conclusion if the judge who ruled on Mack's Rule 32 petition had also presided over his trial, Ex parte Gissendanner, 288 So. 3d 1011, 1028 (Ala. 2019), but that is not the case. Thus, although the circuit court was

94

in the better position to evaluate the credibility of the witnesses who testified at the Rule 32 hearing, Clark v. State, 196 So. 3d 285, 300 (Ala. Crim. App. 2015), that court was in no better position than this Court to determine whether there is a reasonable probability that the mitigating evidence presented at the Rule 32 hearing would have made a difference in the penalty phase of Mack's trial. See Brooks v. State, 340 So. 3d 410, 427 (Ala. Crim. App. 2020) ("[T]he judge who presided over Brooks's capital-murder trial and imposed Brooks's death sentence did not preside over Brooks's Rule 32 evidentiary hearing. Thus, this Court does not accord 'considerable weight' to the circuit court's judgment as to whether Brooks was prejudiced by his counsels' performance.").

That said, it is certainly possible that, if Williams and Sutton had presented mitigating evidence from Mack's background, then at least 1 of the 10 jurors who voted for the death penalty might have been swayed to change his or her vote, which would have meant that the jury's sentencing recommendation could not have been for the death penalty. See § 13A-5-46(f), Ala. Code 1975 (providing, at the time of Mack's offense, that a jury's death-sentence recommendation required the vote of at least 10 jurors). However, I have already explained that Mack's

background is a "double-edged sword," <u>Reed</u>, 875 So. 2d at 437, and, if the door had been opened for the State to present a complete picture of his checkered past, it is equally possible that none of the 10 jurors who voted for the death penalty would have been swayed to change their votes; it is also possible that one or both of the jurors who voted for a sentence of life imprisonment without the possibility of parole would have voted differently, concluding that the damning aspects of Mack's past tended to negate any of the mitigating aspects.[16]

In addition, the majority contends that the mitigating evidence from Mack's background "'"is exactly the sort of evidence that garners the most sympathy from jurors."'" ___ So. 3d at ___ (quoting <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1147 (10th Cir. 2007)). I do not dispute that such evidence <u>might</u> be considered mitigating by some juries, but this Court has previously explained that evidence regarding a defendant's

---

[16]The State did present the jury with a certified copy of Mack's assault-with-a-deadly-weapon conviction, but the State did not present the jury with the facts of that offense, which, as I have explained, were strikingly similar to the facts of Holman's murder. The State also did not present the jury with evidence indicating that Mack had committed child abuse, sold and used illegal drugs, and been dishonorably discharged from the Marine Corps for physically attacking an officer.

difficult childhood is potentially a "double-edged sword" that might actually work against the defendant:

> "'Evidence of a difficult childhood has been characterized as a "double-edged" sword. See Bacon v. Lee, 225 F.3d 470, 481 (4th Cir. 2000). "[E]mphasizing a client's deprived childhood [might] not have a very beneficial impact on a … jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct." Card v. Dugger, 911 F.2d 1494, 1511 (11th Cir. 1990). What one juror finds to be mitigation another juror may find aggravating. "[M]itigation may be in the eye of the beholder." Stanley v. Zant, 697 F.2d 955, 969 (11th Cir. 1983).'"

McWhorter, 142 So. 3d at 1248 (quoting Davis v. State, 44 So. 3d 1118, 1141 (Ala. Crim. App. 2009)). Thus, there is no guarantee that the jury would have found the evidence of Mack's difficult childhood to be mitigating, especially given the negative evidence from Mack's background that the State could have presented in rebuttal. See Burger, 483 U.S. at 794 (noting that any "sympathy" the jury might have felt for the defendant as a result of his "tragic childhood" might have been offset by the violent aspects of his background).

Furthermore, at the time of Mack's offense, § 13A-5-49, Ala. Code 1975, provided only eight aggravating circumstances, and the State proved three of those in Mack's trial. As the United States Court of Appeals for the Eleventh Circuit has explained: "[S]ubstantial evidence

97

of aggravating circumstances … makes it more difficult to establish prejudice under <u>Strickland</u>." <u>Holsey v. Warden, Georgia Diagnostic Prison</u>, 694 F.3d 1230, 1269 (11th Cir. 2012). <u>Compare</u> <u>Williams</u>, 542 F.3d at 1343 ("Further supporting a finding of prejudice is the fact that this case is not highly aggravated.").

For the foregoing reasons, I cannot say that there is a <u>substantial</u> likelihood that the mitigating evidence from Mack's background would have made a difference in the penalty phase of his trial; at most, I can say that it is <u>conceivable</u> that such evidence might have made a difference, which is not enough to establish the prejudice required by <u>Strickland</u>. <u>Harrington</u>, 562 U.S. at 111-12. Thus, even if Williams and Sutton performed deficiently in the penalty phase of Mack's trial, which they did not, their deficient performance does not entitle Mack to relief from his death sentence. <u>See</u> <u>Carter</u>, 443 F.3d at 531, 532 (noting, in holding that the defendant had not been prejudiced by his counsel's allegedly deficient performance, that, "had [the defendant's] family members' testimony been admitted, the prosecutor would have been free to extract testimony of [his] criminal history, his history of drug use and alcohol abuse, and his notoriously quick temper and violent character";

"it is 'not even deficient performance, let alone prejudicial,' for trial counsel to fail to introduce evidence of a defendant's background that 'would likely [make] him look even worse to the jury'" (quoting Moore v. Parker, 425 F.3d 250, 254 (6th Cir. 2005))); and Davis v. Executive Dir. of Dep't of Corr., 100 F.3d 750, 762 (10th Cir. 1996) (holding that the defendant could not establish the prejudice required by Strickland in a case where defense counsel chose not to present mitigating evidence from the defendant's background because his background also "contained numerous instances of conduct that was more likely to make a jury feel unsympathetic towards him, than sympathetic towards him").

Conclusion

This is not a case in which the defendant received ineffective assistance of counsel. Rather, this is a case in which a judge who was not involved in the defendant's trial has concluded, almost 30 years after the fact and with the benefit of hindsight, that defense counsel should have done more in the penalty phase of trial, despite the fact that counsel presented substantial and compelling mitigating evidence on the defendant's behalf. The United States Supreme Court has repeatedly made clear that it is not the role of courts to second-guess defense

99

counsel's strategy, <u>Harrington</u>, 562 U.S. at 105, and, with all due respect

to the circuit court, it is my opinion that this case constitutes a textbook

example of such second-guessing. Thus, I would reverse the circuit

court's judgment, insofar as it granted relief on Mack's ineffective-

assistance-of-counsel claim, and would remand the case for that court to

reinstate Mack's death sentence.[17]

     Windom, P.J., concurs.

---

[17]The circuit court denied relief on Mack's claim that his death sentence is unconstitutional, and Mack has cross-appealed to challenge that part of the court's judgment. Because it has affirmed the circuit court's ruling vacating Mack's death sentence, the majority dismisses Mack's cross-appeal as moot, though it notes that there is no merit to Mack's argument. I agree that there is no merit to that argument, but, because I would reverse and remand for the circuit court to reinstate Mack's death sentence, I would affirm that part of the judgment that Mack challenges, rather than dismiss Mack's cross-appeal as moot.